AT&T CORP. ET AL. *v.* IOWA UTILITIES BOARD ET AL.

No. 97–826.   Argued October 13, 1998—Decided January 25, 1999*

---

*Together with *AT&T Corp. et al.* v. *California et al.* (see this Court's Rule 12.4), No. 97–829, *MCI Telecommunications Corp.* v. *Iowa Utilities Board et al., MCI Telecommunications Corp.* v. *California et al.* (see this Court's Rule 12.4), No. 97–830, *Association for Local Telecommunications Services et al.* v. *Iowa Utilities Board et al.,* No. 97–831, *Federal Communications Commission et al.* v. *Iowa Utilities Board et al., Federal Communications Commission et al.* v. *California et al.* (see this Court's Rule 12.4), No. 97–1075, *Ameritech Corp. et al.* v. *Federal Communications Commission et al.,* No. 97–1087, *GTE Midwest Inc.* v. *Federal Communications Commission et al.,* No. 97–1099, *U S WEST, Inc.* v. *Federal Communications Commission et al.,* and No. 97–1141, *Southern New England Telephone Co. et al.* v. *Federal Communications Commission et al.,* also on certiorari to the same court.

368

*Solicitor General Waxman* argued the cause for the federal petitioners/cross-respondents. With him on the briefs were *Assistant Attorney General Klein, Deputy Solicitor General Wallace, Jonathan E. Nuechterlein, Catherine G. O'Sullivan, Robert B. Nicholson, Nancy C. Garrison, Christopher J. Wright, Laurence N. Bourne,* and *James M. Carr.*

*Bruce J. Ennis, Jr.,* argued the cause for the private petitioners/cross-respondents. With him on the briefs were *Donald B. Verrilli, Jr., Mark D. Schneider, Anthony C. Epstein, Thomas F. O'Neil III,* and *William Single IV. Mitchell F. Brecher, Richard J. Metzger, Albert H. Kramer, Daniel M. Waggoner, Robert G. Berger, Joseph Sandri, Daniel L. Brenner, Neal M. Goldberg,* and *David L. Nicoll* filed briefs for petitioners/respondents Local Telecommunications Services et al.

*Diane Munns* argued the cause for the State Commission respondents et al. With her on the brief were *Lawrence G. Malone* and *Penny Rubin. Peter Arth, Jr.,* and *Mark Fogelman* filed a brief for respondent State of California.

*Laurence H. Tribe* argued the cause for the private respondents/cross-petitioners. With him on the briefs were *Jonathan S. Massey, Mark L. Evans, Michael K. Kellogg, Sean A. Lev, Charles R. Morgan, William B. Barfield, M. Robert Sutherland, James R. Young, Michael E. Glover,*

*Patricia Diaz Dennis, Liam S. Coonan, Michael J. Zpevak, Stephen B. Higgins,* and *James W. Erwin. Kenneth S. Geller, Donald M. Falk, Stephen M. Shapiro, John R. Muench,* and *Gary S. Feinerman* filed briefs for respondent/cross-petitioner Ameritech Corporation. *Mark R. Kravitz, Jeffrey R. Babbin, Daniel J. Klau, Diane Smith, Carolyn C. Hill, Thomas E. Taylor, Jack B. Harrison, Jerry W. Amos, M. John Bowen, Jr.,* and *Paul J. Feldman* filed a brief for respondents/cross-petitioners Mid-Sized Local Exchange Carriers. *Gary M. Epstein, Maureen E. Mahoney,* and *Richard P. Bress* filed a brief for respondents United States Telephone Association et al. *Lloyd N. Cutler, William T. Lake, John H. Harwood II,* and *Robert B. McKenna* filed briefs for respondent/cross-petitioner U S WEST, Inc. Briefs in support of petitioners under this Court's Rule 12.6 were filed for respondent Competition Policy Institute by *Glen B. Manishin,* and for respondent GST Telecom, Inc., by *J. Jeffrey Mayhook.*

*William P. Barr* argued the cause for cross-petitioners/respondents GTE entities et al. With him on the briefs were *M. Edward Whelan, Paul T. Cappuccio,* and *Steven G. Bradbury.*

*David W. Carpenter* argued the cause for petitioners/cross-respondents AT&T et al. With him on the briefs were *Peter D. Keisler, Mark C. Rosenblum, Charles H. Helein, Robert M. McDowell, Harisha J. Bastiampillai, Genevieve Morelli, Robert J. Aamoth, James M. Smith, Leon M. Kestenbaum, Jay C. Keithley, H. Richard Juhnke,* and *Richard S. Whitt.*†

JUSTICE SCALIA delivered the opinion of the Court.

In these cases we address whether the Federal Communications Commission has authority to implement certain pricing and nonpricing provisions of the Telecommunications Act of 1996, as well as whether the Commission's rules governing

---

†*Jonathan Jacob Nadler* filed a brief for Covad Communications Co. as *amicus curiae* urging reversal.

unbundled access and "pick and choose" negotiation are consistent with the statute.

I

Until the 1990's, local phone service was thought to be a natural monopoly. States typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network. Technological advances, however, have made competition among multiple providers of local service seem possible, and Congress recently ended the longstanding regime of state-sanctioned monopolies.

The Telecommunications Act of 1996 (1996 Act or Act), Pub. L. 104–104, 110 Stat. 56, fundamentally restructures local telephone markets. States may no longer enforce laws that impede competition, and incumbent LECs are subject to a host of duties intended to facilitate market entry. Foremost among these duties is the LEC's obligation under 47 U. S. C. § 251(c) (1994 ed., Supp. II) to share its network with competitors. Under this provision, a requesting carrier can obtain access to an incumbent's network in three ways: It can purchase local telephone services at wholesale rates for resale to end users; it can lease elements of the incumbent's network "on an unbundled basis"; and it can interconnect its own facilities with the incumbent's network.[1] When an en-

---

[1] Title 47 U. S. C. § 251(c) (1994 ed., Supp. II) provides as follows:
"Additional Obligations of Incumbent Local Exchange Carriers
"In addition to the duties contained in subsection (b) of this section, each incumbent local exchange carrier has the following duties:
"(1) Duty to Negotiate
"The duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of agreements to fulfill the

trant seeks access through any of these routes, the incumbent can negotiate an agreement without regard to the du-

---

duties described in paragraphs (1) through (5) of subsection (b) of this section and this subsection. The requesting telecommunications carrier also has the duty to negotiate in good faith the terms and conditions of such agreements.

"(2) Interconnection

"The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network—

"(A) for the transmission and routing of telephone exchange service and exchange access;

"(B) at any technically feasible point within the carrier's network;

"(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and

"(D) on rates, terms, and conditions that are just, reasonable, and non-discriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.

"(3) Unbundled Access

"The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title. An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

"(4) Resale

"The duty—

"(A) to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers; and

"(B) not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service, except that a State commission may, consistent with regulations prescribed by the Commission under this section, prohibit a reseller that obtains at wholesale rates a telecommunications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers.

"(5) Notice of Changes

ties it would otherwise have under §251(b)[2] or §251(c).   See §252(a)(1).   But if private negotiation fails, either party can petition the state commission that regulates local phone service to arbitrate open issues, which arbitration is subject to §251 and the FCC regulations promulgated thereunder.

Six months after the 1996 Act was passed, the FCC issued its First Report and Order implementing the local-

---

"The duty to provide reasonable public notice of changes in the information necessary for the transmission and routing of services using that local exchange carrier's facilities or networks, as well as of any other changes that would affect the interoperability of those facilities and networks.

"(6) Collocation

"The duty to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier, except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations."

[2] Section 251(b) imposes the following duties on incumbents:

"(1) Resale

"The duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services.

"(2) Number Portability

"The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission.

"(3) Dialing Parity

"The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing, with no unreasonable dialing delays.

"(4) Access to Rights-of-Way

"The duty to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224 of this title.

"(5) Reciprocal Compensation

"The duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications."

competition provisions. *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* 11 FCC Rcd 15499 (1996) (First Report & Order). The numerous challenges to this rulemaking, filed across the country by incumbent LECs and state utility commissions, were consolidated in the United States Court of Appeals for the Eighth Circuit.

The basic attack was jurisdictional. The LECs and state commissions insisted that primary authority to implement the local-competition provisions belonged to the States rather than to the FCC. They thus argued that many of the local-competition rules were invalid, most notably the one requiring that prices for interconnection and unbundled access be based on "Total Element Long Run Incremental Cost" (TELRIC)—a forward-looking rather than historic measure.[3] See 47 CFR §§ 51.503, 51.505 (1997). The Court of Appeals agreed, and vacated the pricing rules, and several other aspects of the order, as reaching beyond the Commission's jurisdiction. *Iowa Utilities Board* v. *FCC,* 120 F. 3d 753, 800, 804, 805–806 (1997). It held that the general rulemaking authority conferred upon the Commission by the Communications Act of 1934 extended only to interstate matters, and that the Commission therefore needed specific congressional authorization before implementing provisions of the 1996 Act addressing intrastate telecommunications. *Id.,* at 795. It found no such authorization for the Commission's rules regarding pricing, dialing parity,[4] exemptions

---

[3] TELRIC pricing is based upon the cost of operating a hypothetical network built with the most efficient technology available. Incumbents argued below that this method was unreasonable because it stranded their historic costs and underestimated the actual costs of providing interconnection and unbundled access. The Eighth Circuit did not reach this issue, and the merits of TELRIC are not before us.

[4] Dialing parity, which seeks to ensure that a new entrant's customers can make calls without having to dial an access code, was addressed in the Commission's Second Report and Order. See *In re Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,*

for rural LECs, the proper procedure for resolving local-competition disputes, and state review of pre-1996 interconnection agreements. *Id.*, at 795–796, 802–806. Indeed, with respect to some of these matters, the Eighth Circuit said that the 1996 Act had affirmatively given exclusive authority to the state commissions. *Id.*, at 795, 802, 805.

The Court of Appeals found support for its holdings in 47 U. S. C. § 152(b) (§ 2(b) of the Communications Act of 1934), which, it said, creates a presumption in favor of preserving state authority over intrastate communications. 120 F. 3d, at 796. It found nothing in the 1996 Act clear enough to overcome this presumption, which it described as a fence that is "hog tight, horse high, and bull strong, preventing the FCC from intruding on the states' intrastate turf." *Id.*, at 800.

Incumbent LECs also made several challenges, only some of which are relevant here, to the rules implementing the 1996 Act's requirement of unbundled access. See 47 U. S. C. § 251(c)(3) (1994 ed., Supp. II). Rule 319, the primary unbundling rule, sets forth a minimum number of network elements that incumbents must make available to requesting carriers. See 47 CFR § 51.319 (1997). The LECs complained that, in compiling this list, the FCC had virtually ignored the 1996 Act's requirement that it consider whether access to proprietary elements was "necessary" and whether lack of access to nonproprietary elements would "impair" an entrant's ability to provide local service. See 47 U. S. C. § 251(d)(2) (1994 ed., Supp. II). In addition, the LECs thought that the list included items (like directory assistance and caller I. D.) that did not meet the statutory definition of "network element." See § 153(29). The Eighth Circuit rebuffed both arguments, holding that the Commission's in-

---

11 FCC Rcd 19392 (1996). In a separate opinion that is also before us today, the Eighth Circuit vacated this rule insofar as it went beyond the FCC's jurisdiction over interstate calls. *People of California* v. *FCC*, 124 F. 3d 934, 943 (1997).

terpretations of the "necessary and impair" standard and the definition of "network element" were reasonable and hence lawful under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc. (NRDC)*, 467 U. S. 837 (1984). See 120 F. 3d, at 809–810.

When it promulgated its unbundling rules, the Commission explicitly declined to impose a requirement of facility ownership on carriers who sought to lease network elements. First Report & Order ¶¶ 328–340. Because the list of elements that Rule 319 made available was so extensive, the effect of this omission was to allow competitors to provide local phone service relying solely on the elements in an incumbent's network. The LECs argued that this "all elements" rule undermined the 1996 Act's goal of encouraging entrants to develop their own facilities. The Court of Appeals, however, deferred to the FCC's approach. Nothing in the 1996 Act itself imposed a requirement of facility ownership, and the court was of the view that the language of § 251(c)(3) indicated that "a requesting carrier may achieve the capability to provide telecommunications services completely through access to the unbundled elements of an incumbent LECs' network." 120 F. 3d, at 814.

Given the sweep of the "all elements" rule, however, the Eighth Circuit thought that the FCC went too far in its Rule 315(b), which forbids incumbents to separate network elements before leasing them to competitors. 47 CFR § 51.315(b) (1997). Taken together, the two rules allowed requesting carriers to lease the incumbent's entire, preassembled network. The Court of Appeals believed that this would render the resale provision of the statute a dead letter, because by leasing the entire network rather than purchasing and reselling service offerings, entrants could obtain the same product—finished service—at a cost-based, rather than wholesale, rate. 120 F. 3d, at 813. Apparently reasoning that the word "unbundled" in § 251(c)(3) meant "physi-

cally separated," the court vacated Rule 315(b) for requiring access to the incumbent LECs' network elements "on a bundled rather than an unbundled basis." *Ibid.*

Finally, incumbent LECs objected to the Commission's "pick and choose" rule, which governs the terms of agreements between LECs and competing carriers. Under this rule, a carrier may demand that the LEC make available to it "any individual interconnection, service, or network element arrangement" on the same terms and conditions the LEC has given anyone else in an agreement approved under §252— without its having to accept the other provisions of the agreement. 47 CFR §51.809 (1997); First Report & Order ¶¶1309–1310. The Court of Appeals vacated the rule, reasoning that it would deter the "voluntarily negotiated interconnection agreements" that the 1996 Act favored, by making incumbent LECs reluctant to grant quids for quos, so to speak, for fear that they would have to grant others the same quids without receiving quos. 120 F. 3d, at 801.

The Commission, MCI, and AT&T petitioned for review of the Eighth Circuit's holdings regarding jurisdiction, Rule 315(b), and the "pick and choose" rule; the incumbent LECs cross-petitioned for review of the Eighth Circuit's treatment of the other unbundling issues. We granted all the petitions. 522 U. S. 1089 (1998).

## II

Section 201(b), a 1938 amendment to the Communications Act of 1934, provides that "[t]he Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this Act." 52 Stat. 588, 47 U. S. C. §201(b). Since Congress expressly directed that the 1996 Act, along with its local-competition provisions, be inserted into the Communications Act of 1934, 1996 Act, §1(b), 110 Stat. 56, the Commission's rulemaking authority

would seem to extend to implementation of the local-competition provisions.[5]

The incumbent LECs and state commissions (hereinafter respondents) argue, however, that §201(b) rulemaking authority is limited to those provisions dealing with purely *interstate and foreign* matters, because the first sentence of §201(a) makes it "the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor . . . ." It is impossible to understand how this use of the qualifier "interstate or foreign" in §201(a), which limits the class of common carriers with the duty of providing communication service, reaches forward into the last sentence of §201(b) to limit the class of provisions that the Commission has authority to implement. We think that the grant in §201(b) means what it says: The FCC has rulemaking authority to carry out the "provisions of this Act," which include §§251 and 252, added by the Telecommunications Act of 1996.[6]

---

[5] JUSTICE BREYER says, *post*, at 420, that "Congress enacted [the] language [of §201(b)] in 1938," and that whether it confers "general authority to make rules implementing the more specific terms of a later enacted statute depends upon what that later enacted statute contemplates." That is assuredly true. But we think that what the later statute contemplates is best determined, not by speculating about what the 1996 Act (and presumably every other amendment to the Communications Act since 1938) "foresees," *ibid.*, but by the clear fact that the 1996 Act was adopted, not as a freestanding enactment, but as an amendment to, and hence *part of*, an Act which said that "[t]he Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this Act." JUSTICE BREYER cannot plausibly assert that the 1996 Congress was unaware of the general grant of rulemaking authority contained within the Communications Act, since §251(i) specifically provides that "[n]othing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201."

[6] JUSTICE BREYER appeals to our cases which say that there is a "'presumption against the pre-emption of state police power regulations,'" *post*, at 420, quoting from *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 518

Our view is unaffected by 47 U. S. C. § 152(b) (§ 2(b) of the 1934 enactment), which reads:

"Except as provided in sections 223 through 227 . . . , inclusive, and section 332 . . . , and subject to the provisions of section 301 of this title . . . , nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to . . . charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service . . . ."

The local-competition provisions are not identified in § 152(b)'s "except" clause. Seizing on this omission, respondents argue that the 1996 Act does nothing to displace the presumption that the States retain their traditional authority over local phone service.

Respondents' argument on this point is (necessarily) an extremely subtle one. They do not contend that the "noth-

---

(1992), and that there must be " 'clear and manifest' showing of congressional intent to supplant traditional state police powers," *post*, at 420, quoting from *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). But the question in these cases is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States. With regard to the matters addressed by the 1996 Act, it unquestionably has. The question is whether the state commissions' participation in the administration of the new *federal* regime is to be guided by federal-agency regulations. If there is any "presumption" applicable to this question, it should arise from the fact that a federal program administered by 50 independent state agencies is surpassing strange.

The appeals by both JUSTICE THOMAS and JUSTICE BREYER to what might loosely be called "States' rights" are most peculiar, since there is no doubt, even under their view, that if the federal courts believe a state commission is not regulating in accordance with federal policy they may bring it to heel. This is, at bottom, a debate not about whether the States will be allowed to do their own thing, but about whether it will be the FCC or the federal courts that draw the lines to which they must hew. To be sure, the FCC's lines can be even more restrictive than those drawn by the courts—but it is hard to spark a passionate "States' rights" debate over that detail.

ing . . . shall be construed" provision prevents all "appl[ication]" of the Communications Act, as amended in 1996, to intrastate service, or even precludes all "Commission jurisdiction with respect to" such service. Such an interpretation would utterly nullify the 1996 amendments, which clearly "apply" to intrastate service, and clearly confer "Commission jurisdiction" over some matters. Respondents argue, therefore, that the effect of the "[N]othing . . . shall be construed" provision is to require an *explicit* "appl[ication]" to intrastate service, *and in addition an explicit conferral of "Commission jurisdiction" over intrastate service,* before Commission jurisdiction can be found to exist. Such explicit "appl[ication]," they acknowledge, was effected by the 1996 amendments, but "Commission jurisdiction" was explicitly conferred only as to a few matters.

The fallacy in this reasoning is that it ignores the fact that § 201(b) *explicitly* gives the FCC jurisdiction to make rules governing matters to which the 1996 Act applies. Respondents argue that avoiding this *pari passu* expansion of Commission jurisdiction with expansion of the substantive scope of the Act was the reason the "nothing shall be construed" provision was framed in the alternative: "[N]othing in this Act shall be construed to apply *or to give the Commission jurisdiction*" (emphasis added) with respect to the forbidden subjects. The italicized portion would have no operative effect, they assert, if every "application" of the Act automatically entailed Commission jurisdiction. The argument is an imaginative one, but ultimately fails. For even though "Commission jurisdiction" always follows where the Act "applies," Commission jurisdiction (so-called "ancillary" jurisdiction) *could* exist even where the Act does *not* "apply." The term "apply" limits the substantive reach of the statute (and the concomitant scope of primary FCC jurisdiction), and the phrase "or to give the Commission jurisdiction" limits, in addition, the FCC's *ancillary* jurisdiction.

The need for both limitations is exemplified by *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U. S. 355 (1986), where the FCC claimed authority to issue rules governing depreciation methods applied by local telephone companies.[7] The Commission supported its claim with two arguments. First, that it could regulate intrastate because Congress had intended the depreciation provisions of the Communications Act to bind state commissions—*i. e.*, that the depreciation provisions "applied" to intrastate ratemaking. *Id.*, at 376–377. We observed that "[w]hile it is, no doubt, possible to find some support in the broad language of the section for respondents' position, we do not find the meaning of the section so unambiguous or straightforward as to override the command of § 152(b) . . . ." *Id.*, at 377. But the Commission also argued that, even if the statute's depreciation provisions did not apply intrastate, regulation of state depreciation methods would enable it to effectuate the federal policy of encouraging competition in interstate telecommunications. *Id.*, at 369. We rejected that argument because, even though the FCC's broad regulatory authority normally would have been enough to justify its regulation of intrastate depreciation methods that affected interstate commerce, see *id.*, at 370; cf. *Shreveport Rate Cases*, 234 U. S. 342, 358 (1914), § 152(b) prevented the Commission from taking intrastate action solely because it furthered an interstate goal. 476 U. S., at 374.[8]

---

[7] We discuss the *Louisiana* case because of the light it sheds upon the meaning of § 152(b). We of course do not agree with JUSTICE BREYER's contention, *post*, at 421, that the case "raised a question almost identical to the one before us." That case involved the Commission's attempt to regulate services over which it had not explicitly been given rulemaking authority; this one involves its attempt to regulate services over which it *has* explicitly been given rulemaking authority.

[8] Because this reasoning clearly gives separate meanings to the provisions "apply" and "give the Commission jurisdiction," we do not understand why JUSTICE THOMAS asserts, *post*, at 409, that we have not given effect to every word that Congress used. Nor do we agree with JUSTICE

The parties have devoted some effort in these cases to debating whether § 251(d) serves as a jurisdictional grant to the FCC. That section provides that "[w]ithin 6 months

THOMAS that our interpretation renders § 152(b) a nullity. See *ibid.* After the 1996 Act, § 152(b) may have less practical effect. But that is because Congress, by extending the Communications Act into local competition, has removed a significant area from the States' exclusive control. Insofar as Congress has remained silent, however, § 152(b) continues to function. The Commission could not, for example, regulate any aspect of intrastate communication *not* governed by the 1996 Act on the theory that it had an ancillary effect on matters within the Commission's primary jurisdiction.

JUSTICE THOMAS admits, as he must, that the Commission has authority to implement at least some portions of the 1996 Act. See *post,* at 406. But his interpretation of § 152(b) confers such inflexibility upon that provision that he must strain to explain where the Commission gets this authority. A number of the provisions he relies on plainly read, not like conferrals of authority, but like references to the exercise of authority conferred elsewhere (we think, of course, in § 201(b)). See, *e. g.,* § 251(b)(2) (assigning state commissions "[t]he duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission"); § 251(d)(2) (setting forth factors for the Commission to consider "[i]n determining what network elements should be made available for purposes of subsection (c)(3)"); § 251(g) (requiring that any pre-existing "regulation, order, or policy of the Commission" governing exchange access and interconnection agreements remain in effect until it is "explicitly superseded by regulations prescribed by the Commission"). Moreover, his interpretation produces a most chopped-up statute, conferring Commission jurisdiction over such curious and isolated matters as "number portability, . . . those network elements that the carrier must make available on an unbundled basis for purposes of § 251(c), . . . numbering administration, . . . exchange access and interconnection requirements in effect prior to the Act's effective date, . . . and treatment of comparable carriers as incumbents . . . ," *post,* at 406, but denying Commission jurisdiction over much more significant matters. We think it most unlikely that Congress created such a strange hodgepodge. And, of course, JUSTICE THOMAS's recognition of *any* FCC jurisdiction over intrastate matters subjects his analysis to the same criticism he levels against us, *post,* at 409: Just as it is true that Congress did not explicitly amend § 152(b) to exempt the entire 1996 Act, neither did it explicitly amend § 152(b) to exempt the five provisions he relies upon.

after [the date of enactment of the Telecommunications Act of 1996,] the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section." 47 U. S. C. § 251(d) (1994 ed., Supp. II). The FCC relies on this section as an alternative source of jurisdiction, arguing that if it was necessary for Congress to include an express jurisdictional grant in the 1996 Act, § 251(d) does the job. Respondents counter that this provision functions only as a time constraint on the exercise of regulatory authority that the Commission has been given in the six subsections of § 251 that specifically mention the FCC. See §§ 251(b)(2), 251(c)(4)(B), 251(d)(2), 251(e), 251(g), 251(h)(2). Our understanding of the Commission's general authority under § 201(b) renders this debate academic.[9]

The jurisdictional objections we have addressed thus far pertain to an asserted lack of what might be called underlying FCC jurisdiction. The remaining jurisdictional argument is that certain individual provisions in the 1996 Act negate particular aspects of the Commission's implementing authority. With regard to pricing, respondents point to § 252(c), which provides:

---

[9] JUSTICE THOMAS says that the grants of authority to the Commission in § 251 would have been unnecessary "[i]f Congress believed . . . that § 201(b) provided the FCC with plenary authority to promulgate regulations." *Post*, at 408. We have already explained that three of the five provisions on which JUSTICE THOMAS relies are not grants of authority at all. See n. 8, *supra*. And the remaining two do not support his argument because they are not redundant of § 201(b). Section 251(e), which provides that "[t]he Commission shall create or designate one or more impartial entities to administer telecommunications numbering," *requires* the Commission to exercise its rulemaking authority, as opposed to § 201(b), which merely authorizes the Commission to promulgate rules if it so chooses. Section 251(h)(2) says that the FCC "may, by rule, provide for the treatment of a local exchange carrier . . . as an incumbent local exchange carrier for purposes of [§ 251]" if the carrier satisfies certain requirements. This provision gives the Commission authority beyond that conferred by § 201(b); without it, the FCC certainly could not have saddled a nonincumbent carrier with the burdens of incumbent status.

"(c) Standards for Arbitration

"In resolving by arbitration under subsection (b) any open issues and imposing conditions upon the parties to the agreement, a State commission shall—

"(1) ensure that such resolution and conditions meet the requirements of section 251, including the regulations prescribed by the Commission pursuant to section 251;

"(2) establish any rates for interconnection, services, or network elements according to subsection (d); and

"(3) provide a schedule for implementation of the terms and conditions by the parties to the agreement."

Respondents contend that the Commission's TELRIC rule is invalid because § 252(c)(2) entrusts the task of establishing rates to the state commissions. We think this attributes to that task a greater degree of autonomy than the phrase "establish any rates" necessarily implies. The FCC's prescription, through rulemaking, of a requisite pricing methodology no more prevents the States from establishing rates than do the statutory "Pricing standards" set forth in § 252(d). It is the States that will apply those standards and implement that methodology, determining the concrete result in particular circumstances. That is enough to constitute the establishment of rates.

Respondents emphasize the fact that § 252(c)(1), which requires state commissions to assure compliance with the provisions of § 251, adds "including the regulations prescribed by the Commission pursuant to section 251," whereas § 252(c)(2), which requires state commissions to assure compliance with the pricing standards in subsection (d), says nothing about Commission regulations applicable to subsection (d). There is undeniably a lack of parallelism here, but it seems to us adequately explained by the fact that § 251 specifically *requires* the Commission to promulgate regulations implementing that provision, whereas subsection (d)

of § 252 does not. It seems to us not peculiar that the mandated regulations should be specifically referenced, whereas regulations permitted pursuant to the Commission's § 201(b) authority are not. In any event, the mere lack of parallelism is surely not enough to displace that explicit authority. We hold, therefore, that the Commission has jurisdiction to design a pricing methodology.

For similar reasons, we reverse the Court of Appeals' determinations that the Commission had no jurisdiction to promulgate rules regarding state review of pre-existing interconnection agreements between incumbent LECs and other carriers, regarding rural exemptions, and regarding dialing parity. See 47 CFR §§ 51.303, 51.405, and 51.205–51.215 (1997). None of the statutory provisions that these rules interpret displaces the Commission's general rulemaking authority. While it is true that the 1996 Act entrusts state commissions with the job of approving interconnection agreements, 47 U. S. C. § 252(e) (1994 ed., Supp. II), and granting exemptions to rural LECs, § 251(f), these assignments, like the rate-establishing assignment just discussed, do not logically preclude the Commission's issuance of rules to guide the state-commission judgments. And since the provision addressing dialing parity, § 251(b)(3), does not even mention the States, it is even clearer that the Commission's § 201(b) authority is not superseded.[10]

---

[10] JUSTICE THOMAS notes that it is well settled that state officers may interpret and apply federal law, see, e. g., United States v. Jones, 109 U. S. 513 (1883), which leads him to conclude that there is no constitutional impediment to the interpretation that would give the States general authority, uncontrolled by the FCC's general rulemaking authority, over the matters specified in the particular sections we have just discussed. Post, at 411–412. But constitutional impediments aside, we are aware of no similar instances in which federal policymaking has been turned over to state administrative agencies. The arguments we have been addressing in the last three paragraphs of our text assume a scheme in which Congress has broadly extended its law into the field of intrastate telecommunications,

Finally (as to jurisdiction), respondents challenge the claim in the Commission's First Report & Order that § 208, a provision giving the Commission general authority to hear complaints arising under the Communications Act of 1934, also gives it authority to review agreements approved by state commissions under the local-competition provisions. First Report & Order ¶¶ 121–128. The Eighth Circuit held that the Commission's "perception of its authority . . . is untenable . . . in light of the language and structure of the Act and . . . operation of [§ 152(b)]." 120 F. 3d, at 803. The Court of Appeals erred in reaching this claim because it is not ripe. When, as is the case with this Commission statement, there is no immediate effect on the plaintiff's primary conduct, federal courts normally do not entertain pre-enforcement challenges to agency rules and policy statements. *Toilet Goods Assn., Inc.* v. *Gardner,* 387 U. S. 158 (1967); see also *Lujan* v. *National Wildlife Federation,* 497 U. S. 871, 891 (1990).

### III

### A

We turn next to the unbundling rules, and come first to the incumbent LECs' complaint that the FCC included within the features and services that must be provided to competitors under Rule 319 items that do not (as they must) meet the statutory definition of "network element"—namely, operator services and directory assistance, operational support systems (OSS), and vertical switching functions such as caller I. D., call forwarding, and call waiting. See 47 CFR

---

but in a few specified areas (ratemaking, interconnection agreements, etc.) has left the policy implications of that extension to be determined by state commissions, which—within the broad range of lawful policymaking left open to administrative agencies—are beyond federal control. Such a scheme is decidedly novel, and the attendant legal questions, such as whether federal courts must defer to state agency interpretations of federal law, are novel as well.

§§ 51.319(f)–(g) (1997); First Report & Order ¶ 413. The statute defines "network element" as

> "a facility or equipment used in the provision of a telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service."  47 U. S. C. § 153(29) (1994 ed., Supp. II).

Given the breadth of this definition, it is impossible to credit the incumbents' argument that a "network element" must be part of the physical facilities and equipment used to provide local phone service. Operator services and directory assistance, whether they involve live operators or automation, are "features, functions, and capabilities . . . provided by means of" the network equipment. OSS, the incumbent's background software system, contains essential network information as well as programs to manage billing, repair ordering, and other functions. Section 153(29)'s reference to "databases . . . and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service" provides ample basis for treating this system as a "network element." And vertical switching features, such as caller I. D., are "functions . . . provided by means of" the switch, and thus fall squarely within the statutory definition. We agree with the Eighth Circuit that the Commission's application of the "network element" definition is eminently reasonable. See *Chevron* v. *NRDC*, 467 U. S., at 866.

## B

We are of the view, however, that the FCC did not adequately consider the "necessary and impair" standards when it gave blanket access to these network elements, and others, in Rule 319. That Rule requires an incumbent to provide

requesting carriers with access to a minimum of seven network elements: the local loop, the network interface device, switching capability, interoffice transmission facilities, signaling networks and call-related data bases, operations support systems functions, and operator services and directory assistance. 47 CFR § 51.319 (1997). If a requesting carrier wants access to additional elements, it may petition the state commission, which can make other elements available on a case-by-case basis. § 51.317.

Section 251(d)(2) of the Act provides:

> "In determining what network elements should be made available for purposes of subsection (c)(3) of this section, the Commission shall consider, at a minimum, whether—
>
> "(A) access to such network elements as are proprietary in nature is necessary; and
>
> "(B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer."

The incumbents argue that § 251(d)(2) codifies something akin to the "essential facilities" doctrine of antitrust theory, see generally 3A P. Areeda & H. Hovenkamp, Antitrust Law ¶¶ 771–773 (1996), opening up only those "bottleneck" elements unavailable elsewhere in the marketplace. We need not decide whether, as a matter of law, the 1996 Act requires the FCC to apply *that* standard; it may be that some other standard would provide an equivalent or better criterion for the limitation upon network-element availability that the statute has in mind. But we do agree with the incumbents that the Act requires the FCC to apply *some* limiting standard, rationally related to the goals of the Act, which it has simply failed to do. In the general statement of its methodology set forth in the First Report and Order, the Commission announced that it would regard the "necessary" stand-

ard as having been met regardless of whether "requesting carriers can obtain the requested proprietary element from a source other than the incumbent," since "[r]equiring new entrants to duplicate unnecessarily even a part of the incumbent's network could generate delay and higher costs for new entrants, and thereby impede entry by competing local providers and delay competition, contrary to the goals of the 1996 Act." First Report & Order ¶ 283. And it announced that it would regard the "impairment" standard as having been met if "the failure of an incumbent to provide access to a network element would decrease the quality, or increase the financial or administrative cost of the service a requesting carrier seeks to offer, compared with providing that service *over other unbundled elements in the incumbent LEC's network*," *id.*, ¶ 285 (emphasis added)—which means that comparison with self-provision, or with purchasing from another provider, is excluded. Since any entrant will request the most efficient network element that the incumbent has to offer, it is hard to imagine when the incumbent's failure to give access to the element would not constitute an "impairment" under this standard. The Commission asserts that it deliberately limited its inquiry to the incumbent's own network because no rational entrant would seek access to network elements from an incumbent if it could get better service or prices elsewhere. That may be. But that judgment allows entrants, rather than the Commission, to determine whether access to proprietary elements is necessary, and whether the failure to obtain access to nonproprietary elements would impair the ability to provide services. The Commission cannot, consistent with the statute, blind itself to the availability of elements outside the incumbent's network. That failing alone would require the Commission's rule to be set aside. In addition, however, the Commission's assumption that *any* increase in cost (or decrease in quality) imposed by denial of a network element renders access to that element "necessary," and causes the failure to provide

that element to "impair" the entrant's ability to furnish its desired services, is simply not in accord with the ordinary and fair meaning of those terms. An entrant whose anticipated annual profits from the proposed service are reduced from 100% of investment to 99% of investment has perhaps been "impaired" in its ability to amass earnings, but has not *ipso facto* been "impair[ed] . . . in its ability to provide the services it seeks to offer"; and it cannot realistically be said that the network element enabling it to raise its profits to 100% is "necessary."[11] In a world of perfect competition, in which all carriers are providing their service at marginal cost, the Commission's total equating of increased cost (or decreased quality) with "necessity" and "impairment" might be reasonable; but it has not established the existence of such an ideal world. We cannot avoid the conclusion that, if Congress had wanted to give blanket access to incumbents' networks on a basis as unrestricted as the scheme the Commission has come up with, it would not have included § 251(d)(2) in the statute at all. It would simply have said (as the Commission in effect has) that whatever requested element can be provided must be provided.

When the full record of these proceedings is examined, it appears that that is precisely what the Commission *thought*

---

[11] JUSTICE SOUTER points out that one can say his ability to replace a light bulb is "impaired" by the absence of a ladder, and that a ladder is "necessary" to replace the bulb, even though one "could stand instead on a chair, a milk can, or eight volumes of Gibbon." True enough (and nicely put), but the proper analogy here, it seems to us, is not the absence of a ladder, but the presence of a ladder tall enough to enable one to do the job, but not without stretching one's arm to its full extension. A ladder one-half inch taller is not, "within an ordinary and fair meaning of the word," *post,* at 399, "necessary," nor does its absence "impair" one's ability to do the job. We similarly disagree with JUSTICE SOUTER that a business can be impaired in its *ability* to provide services—even impaired in that ability "in an ordinary, weak sense of impairment," *post,* at 400— when the business receives a handsome profit but is denied an even handsomer one.

Congress had said. The FCC was content with its expansive methodology because of its misunderstanding of § 251(c)(3), which directs an incumbent to allow a requesting carrier access to its network elements "at any technically feasible point." The Commission interpreted this to "impos[e] on an incumbent LEC *the duty to provide all network elements for which it is technically feasible to provide access*," and went on to "conclude that we have authority to establish regulations that are coextensive" with this duty. First Report & Order ¶ 278 (emphasis added). See also *id.*, ¶ 286 ("We conclude that the statute does not require us to interpret the 'impairment' standard in a way that would significantly diminish the obligation imposed by section 251(c)(3)"). As the Eighth Circuit held, that was undoubtedly wrong: Section 251(c)(3) indicates "*where* unbundled access must occur, not *which* [network] elements must be unbundled." 120 F. 3d, at 810. The Commission does not seek review of the Eighth Circuit's holding on this point, and we bring it into our discussion only because the Commission's application of § 251(d)(2) was colored by this error. The Commission began with the premise that an incumbent was obliged to turn over as much of its network as was "technically feasible," and viewed subsection (d)(2) as merely permitting it to soften that obligation by regulatory grace:

> "To give effect to both sections 251(c)(3) and 251(d)(2), we conclude that the proprietary and impairment standards in section 251(d)(2) grant us the authority to refrain from requiring incumbent LECs to provide all network elements for which it is technically feasible to provide access on an unbundled basis." First Report & Order ¶ 279.

The Commission's premise was wrong. Section 251(d)(2) does not authorize the Commission to create isolated exemptions from some underlying duty to make all network elements available. It requires the Commission to determine

on a rational basis *which* network elements must be made available, taking into account the objectives of the Act and giving some substance to the "necessary" and "impair" requirements. The latter is not achieved by disregarding entirely the availability of elements outside the network, and by regarding *any* "increased cost or decreased service quality" as establishing a "necessity" and an "impair[ment]" of the ability to "provide . . . services."

The Commission generally applied the above described methodology as it considered the various network elements *seriatim.* See *id.,* ¶¶ 388–393, 419–420, 447, 481–482, 490–491, 497–499, 521–522, 539–540. Though some of these sections contain statements suggesting that the Commission's action might be supported by a higher standard, see, *e. g., id.,* ¶¶ 521–522, no other standard is consistently applied and we must assume that the Commission's expansive methodology governed throughout. Because the Commission has not interpreted the terms of the statute in a reasonable fashion, we must vacate 47 CFR § 51.319 (1997).

## C

The incumbent LECs also renew their challenge to the "all elements" rule, which allows competitors to provide local phone service relying solely on the elements in an incumbent's network. See First Report & Order ¶¶ 328–340. This issue may be largely academic in light of our disposition of Rule 319. If the FCC on remand makes fewer network elements unconditionally available through the unbundling requirement, an entrant will no longer be able to lease every component of the network. But whether a requesting carrier can access the incumbent's network in whole or in part, we think that the Commission reasonably omitted a facilities-ownership requirement. The 1996 Act imposes no such limitation; if anything, it suggests the opposite, by requiring in § 251(c)(3) that incumbents provide access to "any" requesting carrier. We agree with the Court of Ap-

peals that the Commission's refusal to impose a facilities-ownership requirement was proper.

## D

Rule 315(b) forbids an incumbent to separate already-combined network elements before leasing them to a competitor. As they did in the Court of Appeals, the incumbents object to the effect of this Rule when it is combined with others before us today. TELRIC allows an entrant to lease network elements based on forward-looking costs, Rule 319 subjects virtually all network elements to the unbundling requirement, and the all-elements rule allows requesting carriers to rely only on the incumbent's network in providing service. When Rule 315(b) is added to these, a competitor can lease a complete, preassembled network at (allegedly very low) cost-based rates.

The incumbents argue that this result is totally inconsistent with the 1996 Act. They say that it not only eviscerates the distinction between resale and unbundled access, but that it also amounts to Government-sanctioned regulatory arbitrage. Currently, state laws require local phone rates to include a "universal service" subsidy. Business customers, for whom the cost of service is relatively low, are charged significantly above cost to subsidize service to rural and residential customers, for whom the cost of service is relatively high. Because this universal-service subsidy is built into retail rates, it is passed on to carriers who enter the market through the resale provision. Carriers who purchase network elements at cost, however, avoid the subsidy altogether and can lure business customers away from incumbents by offering rates closer to cost. This, of course, would leave the incumbents holding the bag for universal service.

As was the case for the all-elements rule, our remand of Rule 319 may render the incumbents' concern on this score academic. Moreover, § 254 requires that universal-service

subsidies be phased out, so whatever possibility of arbitrage remains will be only temporary. In any event, we cannot say that Rule 315(b) unreasonably interprets the statute.

Section 251(c)(3) establishes:

> "The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 . . . . An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service."

Because this provision requires elements to be provided in a manner that "allows requesting carriers to combine" them, incumbents say that it contemplates the leasing of network elements in discrete pieces. It was entirely reasonable for the Commission to find that the text does not command this conclusion. It forbids incumbents to sabotage network elements that *are* provided in discrete pieces, and thus assuredly contemplates that elements *may* be requested and provided in this form (which the Commission's rules do not prohibit). But it does not say, or even remotely imply, that elements *must* be provided only in this fashion and never in combined form. Nor are we persuaded by the incumbents' insistence that the phrase "on an unbundle[d] basis" in § 251(c)(3) means "physically separated." The dictionary definition of "unbundle[d]" (and the only definition given, we might add) matches the FCC's interpretation of the word: "to give separate prices for equipment and supporting services." Webster's Ninth New Collegiate Dictionary 1283 (1988).

The reality is that §251(c)(3) is ambiguous on whether leased network elements may or must be separated, and the rule the Commission has prescribed is entirely rational, finding its basis in §251(c)(3)'s nondiscrimination requirement. As the Commission explains, it is aimed at preventing incumbent LECs from "disconnect[ing] previously connected elements, over the objection of the requesting carrier, not for any productive reason, but just to impose wasteful reconnection costs on new entrants." Reply Brief for Federal Petitioners and Brief for Federal Cross-Respondents 23. It is true that Rule 315(b) could allow entrants access to an entire preassembled network. In the absence of Rule 315(b), however, incumbents could impose wasteful costs on even those carriers who requested less than the whole network. It is well within the bounds of the reasonable for the Commission to opt in favor of ensuring against an anticompetitive practice.

## IV

The FCC's "pick and choose" rule provides, in relevant part:

> "An incumbent LEC shall make available without unreasonable delay to any requesting telecommunications carrier any individual interconnection, service, or network element arrangement contained in any agreement to which it is a party that is approved by a state commission pursuant to section 252 of the Act, upon the same rates, terms, and conditions as those provided in the agreement." 47 CFR §51.809 (1997).

Respondents argue that this rule threatens the give-and-take of negotiations, because every concession as to an "interconnection, service, or network element arrangement" made (in exchange for some other benefit) by an incumbent LEC will automatically become available to every potential entrant into the market. A carrier who wants one term

from an existing agreement, they say, should be required to accept *all* the terms in the agreement.

Although the latter proposition seems eminently fair, it is hard to declare the FCC's rule unlawful when it tracks the pertinent statutory language almost exactly. Title 47 U. S. C. § 252(i) (1994 ed., Supp. II) provides:

> "A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement."

The FCC's interpretation is not only reasonable, it is the most readily apparent. Moreover, in some respects the rule is more generous to incumbent LECs than § 252(i) itself. It exempts incumbents who can prove to the state commission that providing a particular interconnection service or network element to a requesting carrier is either (1) more costly than providing it to the original carrier, or (2) technically infeasible. 47 CFR § 51.809(b) (1997). And it limits the amount of time during which negotiated agreements are open to requests under this section. § 51.809(c). The Commission has said that an incumbent LEC can require a requesting carrier to accept all terms that it can prove are "legitimately related" to the desired term. First Report & Order ¶ 1315. Section 252(i) certainly demands no more than that. And whether the Commission's approach will significantly impede negotiations (by making it impossible for favorable interconnection-service or network-element terms to be traded off against unrelated provisions) is a matter eminently within the expertise of the Commission and eminently beyond our ken. We reverse the Eighth Circuit and reinstate the rule.

\* \* \*

It would be gross understatement to say that the 1996 Act is not a model of clarity.  It is in many important respects a model of ambiguity or indeed even self-contradiction.  That is most unfortunate for a piece of legislation that profoundly affects a crucial segment of the economy worth tens of billions of dollars.  The 1996 Act can be read to grant (borrowing a phrase from incumbent GTE) "most promiscuous rights" to the FCC vis-à-vis the state commissions and to competing carriers vis-à-vis the incumbents—and the Commission has chosen in some instances to read it that way. But Congress is well aware that the ambiguities it chooses to produce in a statute will be resolved by the implementing agency, see *Chevron*, 467 U. S., at 842–843.  We can only enforce the clear limits that the 1996 Act contains, which in the present cases invalidate only Rule 319.

For the reasons stated, the July 18, 1997, judgment of the Court of Appeals, 120 F. 3d 753, is reversed in part and affirmed in part; the August 22, 1997, judgment of the Court of Appeals, 124 F. 3d 934, is reversed in part; and the cases are remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR took no part in the consideration or decision of these cases.

JUSTICE SOUTER, concurring in part and dissenting in part.

I agree with the Court's holding that the Federal Communications Commission has authority to implement and interpret the disputed provisions of the Telecommunications Act of 1996, and that deference is due to the Commission's reasonable interpretation under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984).  I disagree with the Court's holding that the Commission was

unreasonable in its interpretation of 47 U. S. C. § 251(d)(2) (1994 ed., Supp. II), which requires it to consider whether competitors' access to network elements owned by local exchange carriers (LECs) is "necessary" and whether failure to provide access to such elements would "impair" competitors' ability to provide services. *Ante,* at 392. Because I think that, under *Chevron,* the Commission reasonably interpreted its duty to consider necessity and impairment, I respectfully dissent from Part III–B of the Court's opinion.

The statutory provision in question specifies that in determining what network elements should be made available on an unbundled basis to potential competitors of the LECs, the Commission "shall consider" whether "access to such network elements as are proprietary in nature is necessary," § 251(d)(2)(A), and whether "the failure to provide access" to network elements "would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer," § 251(d)(2)(B). The Commission interpreted "necessary" to mean "prerequisite for competition," in the sense that without access to certain proprietary network elements, competitors' "ability to compete would be significantly impaired or thwarted." *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* ¶ 282, 11 FCC Rcd 15499, 15641–15642 (1996) (First Report & Order). On this basis, it decided to require access to such elements unless the incumbent LEC could prove both that the requested network element was proprietary and that the requesting competitor could offer the same service through the use of another, nonproprietary element offered by the incumbent LEC. *Id.,* ¶ 283, at 15642.

The Commission interpreted "impair" to mean "diminished in value," and explained that a potential competitor's ability to offer services would diminish in value when the quality of those services would decline or their price rise, absent the element in question. *Id.,* ¶ 285, at 15643. The Commission chose to apply this standard "by evaluating

whether a carrier could offer a service using other unbundled elements within an incumbent LEC's network," *ibid.*, and decided that whenever it would be more expensive for a competitor to offer a service using other available network elements, or whenever the service offered using those other elements would be of lower quality, the LEC must offer the desired element to the competitor, *ibid.*

In practice, as the Court observes, *ante*, at 389, the Commission's interpretation will probably allow a competitor to obtain access to any network element that it wants; a competitor is unlikely in fact to want an element that would be economically unjustifiable, and a weak economic justification will do. Under *Chevron*, the only question before us is whether the Commission's interpretation, obviously favorable to potential competitors, falls outside the bounds of reasonableness.

As a matter of textual justification, certainly, the Commission is not to be faulted. The words "necessary" and "impair" are ambiguous in being susceptible to a fairly wide range of meanings, and doubtless can carry the meanings the Commission identified. If I want to replace a light bulb, I would be within an ordinary and fair meaning of the word "necessary" to say that a stepladder is "necessary" to install the bulb, even though I could stand instead on a chair, a milk can, or eight volumes of Gibbon. I could just as easily say that the want of a ladder would "impair" my ability to install the bulb under the same circumstances. These examples use the concepts of necessity and impairment in what might be called their weak senses, but these are unquestionably still ordinary uses of the words.

Accordingly, the Court goes too far when it says that under "the ordinary and fair meaning" of "necessary" and "impair," *ante*, at 389–390, "[a]n entrant whose anticipated annual profits from the proposed service are reduced from 100% of investment to 99% of investment . . . has not *ipso facto* been 'impair[ed] . . . in its ability to provide the services

it seeks to offer'; and it cannot realistically be said that the network element enabling it to raise profits to 100% is 'necessary,'" *ante,* at 390. A service is surely "necessary" to my business in an ordinary, weak sense of necessity when that service would allow me to realize more profits, and a business can be said to be "impaired" in delivery of services in an ordinary, weak sense of impairment when something stops the business from getting the profit it wants for those services.

Not every choice of meaning that falls within the bounds of textual ambiguity is necessarily reasonable, to be sure, but the Court's appeal to broader statutory policy comes up short in my judgment. The Court says, with some intuitive plausibility, that "the Act requires the FCC to apply *some* limiting standard, rationally related to the goals of the Act, which it has simply failed to do." *Ante,* at 388. In the Court's eyes, the trouble with the Commission's interpretation is that it "allows entrants, rather than the Commission, to determine" necessity and impairment, *ante,* at 389, and so the Court concludes that "if Congress had wanted to give blanket access to incumbents' networks on a basis as unrestricted as the scheme the Commission has come up with, it would not have included § 251(d)(2) in the statute at all," *ante,* at 390.

The Court thus judges the reasonableness of the Commission's rule for implementing § 251(d)(2) by asking how likely it is that Congress would have legislated at all if its point in adopting the criteria of necessity and impairment was to do no more than require economic rationality, and the Court answers that the Commission's notion of the congressional objective in using the ambiguous language is just too modest to be reasonable. The persuasiveness of the Court's answer to its question, however, rests on overlooking the very different question that the Commission was obviously answering when it adopted Rule 319. As the Court itself notes, *ante,*

at 388–389, the Commission explicitly addressed the consequences that would follow from requiring an entrant to satisfy the necessity and impairment criteria by showing that alternative facilities were unavailable at reasonable cost from anyone except the incumbent LEC. First Report & Order ¶ 283, 11 FCC Rcd, at 15642. To require that kind of a showing, the Commission said, would encourage duplication of facilities and personnel, with obvious systemic costs. *Ibid.* The Commission, in other words, was approaching the task of giving reasonable interpretations to "necessary" and "impair" by asking whether Congress would have mandated economic inefficiency as a limit on the objective of encouraging competition through ease of market entry. The Commission concluded, without any apparent implausibility, that the answer was no, and proceeded to implement the necessity and impairment provisions in accordance with that answer.

Before we conclude that the Commission's reading of the statute was unreasonable, therefore, we have to do more than simply ask whether Congress would probably have legislated the necessity and impairment criteria in their weak senses. We have to ask whether the Commission's further question is an irrelevant one, and (if it is not), whether the Commission's answer is reasonably defensible. If the question is sensible and the answer fair, *Chevron* deference surely requires us to respect the Commission's conclusion. This is so regardless of whether the answer to the Commission's question points in a different direction from the answer to the Court's question; there is no apparent reason why deference to the agency should not extend to the agency's choice in responding to mutually ill-fitting clues to congressional meaning. This, indeed, is surely a classic case for such deference, the statute here being infected not only with "ambiguity" but even "self-contradiction." *Ante,* at 397. I would accordingly respect the Commission's choice to give primacy to the question it chose.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE BREYER join, concurring in part and dissenting in part.

Since Alexander Graham Bell invented the telephone in 1876, the States have been, for all practical purposes, exclusively responsible for regulating intrastate telephone service. Although the Telecommunications Act of 1996 altered that more than century-old tradition, the majority takes the Act too far in transferring the States' regulatory authority wholesale to the Federal Communications Commission. In my view, the Act does not unambiguously indicate that Congress intended for such a transfer to occur. Indeed, it specifically reserves for the States the primary responsibility to conduct mediations and arbitrations and to approve agreements between carriers. See 47 U. S. C. §§ 252(c), (e) (1994 ed., Supp. II). I therefore respectfully dissent from Part II of the majority's opinion.[1]

I

From the time that the commercial offering of telephone service began in 1877 until the expiration of key patents in 1893 and 1894, Alexander Graham Bell's telephone company—which came to be known as the American Telephone and Telegraph Company—enjoyed a monopoly. J. Brooks, Telephone: The First Hundred Years 59, 67, 71–72 (1976). In the decades that followed, thousands of independent phone companies emerged to fill in the gaps left by the telephone giant and, in most larger markets, to build rival networks in direct competition with it. Id., at 102–111. As competition developed, many municipalities began to adopt ordinances regulating telephone service. See, e. g., K. Lipartito, The Bell System and Regional Business 177–186 (1989).

During the 1900's, state legislatures came under increasing pressure to centralize the regulation of telephone service.

---

[1] I agree with the majority's analysis of the unbundling and pick-and-choose rules, which were not challenged on jurisdictional grounds.

See, *e. g., id.,* at 185–207. Although the quasi-competitive system had significant drawbacks from the consumers' standpoint—principally the refusal of competing systems to interconnect—perhaps the strongest advocate of state regulation was AT&T itself. *Ibid.* The company's arguments that telephone service was naturally monopolistic and that competition was resulting in wasteful duplication of facilities appealed to Progressive-era legislatures. Cohen, The Telephone Problem and the Road to Telephone Regulation in the United States, 3 J. Policy Hist. 42, 55–57 (1991); see generally Lipartito, *supra,* at 185–207. By 1915, most States had established public utility commissions and charged them with regulating telephone service. Brooks, *supra,* at 144. Over time, the Bell Companies' policy of buying out independent providers coupled with the state commissions' practice of prohibiting competitive entry led back to the monopoly provision of local telephone service. See R. Garnet, The Telephone Enterprise: The Evolution of the Bell System's Horizontal Structure, 1876–1909, 146–153 (1985).

Early federal telecommunications regulation, which began with the Mann-Elkins Act of 1910, did not displace the States' fledgling efforts to regulate intrastate telephone service. To the contrary, the Mann-Elkins Act extended the jurisdiction of the Interstate Commerce Commission (ICC) to cover *only* interstate and international telecommunications services.[2] As a result, state and federal agencies were required to meticulously separate the intrastate and interstate aspects of telephone services. Accordingly, in *Smith* v. *Illinois Bell Telephone Co.,* 282 U. S. 133 (1930), this Court

---

[2] The Mann-Elkins Act provided, in relevant part, that "the provisions of this Act shall apply to . . . telegraph, telephone, and cable companies . . . engaged in sending messages from one State, Territory, or District of the United States, to any other State, Territory or District of the United States, or to any foreign country, who shall be considered and held to be common carriers within the meaning and purpose of this Act." Act of June 18, 1910, ch. 309, § 7, 36 Stat. 544–545.

invalidated an Illinois Commerce Commission order establishing rates for the city of Chicago because it failed to distinguish between the intrastate and interstate property and business of the telephone company. In so doing, the Court emphasized that "[t]he separation of the intrastate and interstate property, revenues and expenses of the Company is . . . essential to the appropriate recognition of the competent governmental authority in each field of regulation." *Id.*, at 148.

In the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 *et seq.*, Congress transferred authority over interstate communications from the ICC to the newly created Federal Communications Commission (FCC or Commission). As in the Mann-Elkins Act, Congress chose not to displace the States' authority over intrastate communications. Indeed, Congress took care to preserve it explicitly in § 2(b), which provides, in relevant part, that "nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to . . . charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service." 47 U. S. C. § 152(b). We have carefully guarded the historical jurisdictional division codified in § 2(b). See *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U. S. 355 (1986). In *Louisiana*, we held that § 2(b) precluded the FCC from pre-empting state depreciation regulations. In so doing, we rejected the FCC's argument that § 220 of the Communications Act of 1934 provided it with authority to displace state regulations that were inconsistent with federal depreciation standards. We instead concluded that § 2(b) "fences off from FCC reach or regulation intrastate matters—indeed, including matters 'in connection with' intrastate service," *id.*, at 370, and we further indicated that the FCC could breach § 2(b)'s jurisdictional "fence" only when Congress used "unambiguous or straightforward" language to give it jurisdiction over intrastate communications, *id.*, at 377.

Congress enacted the Telecommunications Act of 1996 (1996 Act or Act), Pub. L. 104–104, 110 Stat. 56, against this backdrop. To be sure, the 1996 Act marked a significant change in federal telecommunications policy. Most important, Congress ended the States' longstanding practice of granting and maintaining local exchange monopolies. See 47 U. S. C. § 253(a) (1994 ed., Supp. II). It also required incumbent local exchange carriers to allow their competitors to access their facilities in three different ways. As the majority describes more completely, *ante*, at 371–373, n. 1, incumbents must: interconnect their networks with requesting carriers' facilities and equipment, § 251(c)(2); provide nondiscriminatory access to network elements on an unbundled basis at any technically feasible point, § 251(c)(3); and offer to resell at wholesale rates any telecommunications service that they provide to subscribers who are not telecommunications carriers, § 251(c)(4). The Act sets forth additional obligations applicable to all telecommunications carriers, § 251(a), and all local exchange carriers, § 251(b). To facilitate rapid transition from monopoly to competitive provision of local telephone service, Congress set forth a process to ensure that the incumbent and competing carriers fulfill these obligations in § 252.

Section 252 sets up a preference for negotiated interconnection agreements. § 252(a). To the extent that the incumbent and competing carriers cannot agree, the Act gives the state commissions primary responsibility for mediating and arbitrating agreements. Specifically, Congress directed the state commissions to mediate disputes between carriers during the voluntary negotiation period, § 252(a)(2), and—after the negotiations have run their course—to arbitrate any "open issues," § 252(b)(1). In conducting these arbitrations, state commissions are directed to ensure that open issues are resolved in accordance with the requirements of § 251, "establish . . . rates for interconnection, services, or network elements" according to the standards that Congress

set forth in § 252(d), and provide a schedule for implementing the agreement reached during arbitration. § 252(c). The state commissions are also to approve or reject any interconnection agreement, whether adopted by negotiation or arbitration, § 252(e)(1), guided by the standards set forth in § 252(e)(2). The 1996 Act permits the FCC to intervene in this process only as a last resort, when "a State commission fails to act to carry out its responsibilit[ies]." · § 252(e)(5). In that event, "the Commission shall issue an order preempting the State commission's jurisdiction . . . and shall assume the responsibility of the State commission . . . and act for the State commission." *Ibid.*

To be sure, the Act directs the state commissions, in conducting arbitrations, to ensure that open issues are resolved in accordance with the "regulations prescribed by the [FCC] pursuant to section 251," § 252(c)(1), and provides that the state commissions may reject an arbitrated agreement if it does not meet the requirements of § 251, "including the regulations prescribed by the Commission pursuant to section 251," § 252(e)(2)(B). But the scope of the FCC's rulemaking authority under the Act is quite limited. Section 251(d)(1) directs the Commission to "complete all actions necessary to establish regulations to implement the requirements of this section" within a certain time period. I believe that this subsection is a time limitation upon, and a mandate for, the exercise of rulemaking authority conferred elsewhere. The source of that authority, as I describe below, is not § 201(b), but, rather, § 251 itself. Section 251 specifically identifies those subjects upon which the FCC may regulate. The FCC has authority to regulate on the subject of number portability, § 251(b)(2); those network elements that the carrier must make available on an unbundled basis for purposes of § 251(c), § 251(d)(2); numbering administration, § 251(e); exchange access and interconnection requirements in effect prior to the Act's effective date, § 251(g); and treatment of comparable carriers as incumbents, § 251(h)(2).

## II

The regulations that are the subject of the jurisdictional challenge of the respondent LECs and state commissions contravene the division of authority set forth in the 1996 Act and disregard the 100-year tradition of state authority over intrastate telecommunications. In the introduction to its First Report and Order, the FCC peremptorily declared that §§ 251 and 252 *"require* [it] to establish implementing rules to govern interconnection, resale of services, access to unbundled network elements, and other matters, and direct the states to follow the Act and those rules in arbitrating and approving arbitrated agreements under sections 251 and 252." *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* 11 FCC Rcd 15499, 15544–15545 (1996) (emphasis added). In fulfilling its perceived statutory mandate, the FCC promulgated painstakingly detailed regulations dictating to the state commissions how they must implement §§ 251 and 252. I agree with the Eighth Circuit that the FCC lacked jurisdiction to promulgate the regulations challenged on jurisdictional grounds.[3]

## A

In endorsing the FCC's claim that it has general rulemaking authority to implement the local competition provisions of the 1996 Act, the majority relies upon a general grant of authority that predates the Act, 47 U. S. C. § 201(b). The last sentence of that provision, upon which the majority so heavily relies, provides that "[t]he Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter."

---

[3] I agree with the majority, *ante,* at 386, that respondents' challenge to the FCC's assertion that it has authority under 47 U. S. C. § 208 to consider complaints arising under the 1996 Act is not ripe for review. It appears to me, however, that the Court of Appeals' conclusion that the FCC lacks such authority carries considerable force.

This grant of authority, however, cannot be read in isolation. As the first Justice Harlan once observed: "It is a familiar rule in the interpretation of . . . statutes that 'a passage will be best interpreted by reference to that which precedes and follows it.'" *Neal* v. *Clark*, 95 U. S. 704, 708 (1878). Section 201(a) refers exclusively to "interstate or foreign communication by wire or radio," and the first sentence of §201(b) refers to "charges, practices, classifications, and regulations for and in connection with such communication service." "Under the principle of *ejusdem generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Norfolk & Western R. Co.* v. *Train Dispatchers*, 499 U. S. 117, 129 (1991). Applying this principle here, it is clear that the last sentence of §201(b) only gives the FCC authority to promulgate regulations governing interstate and foreign communications. By failing to read §201(b)'s grant of rulemaking authority in light of the limitation that precedes it, the majority attributes to the provision "a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 575 (1995) (quoting *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961)).

That Congress apparently understood §201(b) to be so limited is demonstrated by the fact that the FCC is specifically charged, under the 1996 Act, with issuing regulations that implement particular portions of §251, as I have described, *supra*, at 406. If Congress believed, as does the majority, that §201(b) provided the FCC with plenary authority to promulgate regulations implementing all of the 1996 Act's provisions, it presumably would not have needed to make clear that the FCC had regulatory authority with respect to particular matters.

## B

Moreover, I cannot see how § 201(b) represents an "unambiguous" grant of authority that is sufficient to overcome § 2(b)'s jurisdictional fence. In my view, the majority's interpretation of § 201(b) necessarily implies that Congress *sub silentio* rendered § 2(b) a nullity by extending federal law to cover intrastate telecommunications. That conclusion is simply untenable in light of the fact that § 2(b) is written in the disjunctive. Section 2(b), 47 U. S. C. § 152(b), provides that "nothing in this chapter shall be construed to apply to *or to give the Commission jurisdiction with respect to*" intrastate telecommunications service. (Emphasis added.) Contrary to the majority's suggestion, *ante*, at 380, there is nothing "subtle" or "imaginative" about the principle that "[i]n construing a statute we are obliged to give effect, if possible, to every word Congress used. Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise . . . ." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 339 (1979) (citation omitted). Nor is the majority correct that *Louisiana Pub. Serv. Comm'n* v. *FCC* supports its reading of § 2(b). Indeed, the disjunctive structure of the provision led us to conclude in *Louisiana* that § 2(b) contains both "a rule of statutory construction" and a "substantive jurisdictional limitation on the FCC's power." 476 U. S., at 372–373. It follows that we should give independent legal significance to each. Thus, it is not enough for the majority simply to demonstrate that the 1996 Act "appl[ies] to" intrastate services; it must also point to "unambiguous" and "straightforward" evidence that Congress intended to eliminate § 2(b)'s "substantive jurisdictional limitation."

This they cannot do. Nothing in the 1996 Act eliminates § 2(b)'s jurisdictional fence. Congress has elsewhere demonstrated that it knows how to exempt certain provisions from

§ 2(b)'s reach; indeed, it has done so quite recently. For example, in 1992, Congress enacted legislation providing that § 2(b) shall apply "[e]xcept as provided in sections 223 through 227" of the Communications Act of 1934. Pub. L. 102–243. The following year, Congress also exempted § 301 from § 2(b)'s purview. Pub. L. 103–66. With the 1996 Act, Congress neither eliminated § 2(b) altogether nor added §§ 251 and 252 to the list of provisions exempted from its jurisdictional fence. I believe that we are obliged to honor that choice.

## C

Even if the rulemaking authority granted by § 201(b) was not limited to interstate and international communications *and* the 1996 Act rendered § 2(b) a nullity, the FCC's argument would still fail with respect to its pricing rules and its rules governing the state commissions' approval of interconnection agreements. We have made it clear that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.*, 482 U. S. 437, 445 (1987) (emphasis deleted; internal quotation marks omitted). Section 201(b) at best gives the FCC general rulemaking authority. But the 1996 Act gives the state commissions the primary responsibility for conducting mediations and arbitrations and approving interconnection agreements. Indeed, as I have described, Congress set forth specific standards that the state commissions are to adhere to in setting pricing, § 252(d), and in approving interconnection agreements, § 252(e). The majority appears to believe that Congress expected that the FCC would promulgate rules to "guide the state-commission judgments." *Ante*, at 385. I do not agree. It seems to me that Congress consciously designed a system that respected the States' historical role as the dominant authority with respect to intrastate communications. In giving the state commissions primary responsibility for conducting mediations and arbitrations and for ap-

proving interconnection agreements, I simply do not think that Congress intended to limit States' authority to mechanically apply whatever methodologies, formulas, and rules that the FCC mandated. Because Congress set forth specific provisions giving primary responsibility in certain areas to the States, and because the subsections setting forth the standards that the state commissions are to apply make no mention of FCC regulation, I believe that we are obliged to presume that Congress intended the specific grant of primary authority to the States to control.[4]

## D

My interpretation, of course, would require the state commissions to interpret and implement the substantive provisions of the 1996 Act in those instances where the 1996 Act gave the state commissions primary authority. Several parties have suggested that it is inappropriate for the States to do so. One of the many petitioners in these cases goes so far as to suggest that under our decision in *Printz* v. *United States*, 521 U. S. 898 (1997), the "legitimacy of any such delegation of federal substantive authority [to the States] would be suspect." Brief for Petitioner in No. 97–829, p. 40. To be sure, we held in *Printz* that the Federal Government may not commandeer state executive agencies. But I do not know of a principle of federal law that prohibits the States from interpreting and applying federal law. Indeed, basic principles of federalism compel us to presume that States are competent to do so. As Justice Field observed over 100 years ago in a decision upholding a federal law delegating to the States the authority to determine compensation in takings cases:

---

[4] My conclusion applies with equal force to other FCC regulations that trump the state commissions' responsibilities, including exemptions, suspensions, and modification, § 251(f); approval of agreements predating the Act, § 252(a); and pre-emption of state access regulations that are inconsistent with FCC dictates, § 251(d)(3).

> "[I]t was the purpose of the Constitution to establish a general government independent of, and in some respects superior to, that of the State governments—one which could enforce its own laws through its own officers and tribunals .... Yet from the time of its establishment that government has been in the habit of using, with the consent of the States, their officers, tribunals, and institutions as its agents. Their use has not been deemed violative of any principle or as in any manner derogating from the sovereign authority of the federal government; but as a matter of convenience and as tending to a great saving of expense." *United States* v. *Jones*, 109 U. S. 513, 519–520 (1883).

When, in 1996, Congress decided to attempt to introduce competition into the market for local telephone service, it deemed it wise to take advantage of the policy expertise that the state commissions have developed in regulating such service. It is not for us—or the FCC—to second-guess its decision.

\* \* \*

Contrary to longstanding historical practice, this Court's precedents respecting that practice, and the 1996 Act's adherence to it, the majority grants the FCC unbounded authority to regulate a matter of state concern. Because I do not believe that Congress intended such a result, I respectfully dissent from Part II of the majority's opinion.

JUSTICE BREYER, concurring in part and dissenting in part.

A statute's history and purpose can illuminate its language. When read in light of history, purpose, and precedent, the Telecommunications Act of 1996 (1996 Act or Act), Pub. L. 104–104, 110 Stat. 56, is not the "model of ambiguity" or "self-contradiction" of which the majority complains. *Ante,* at 397. Neither does it permit the Federal Communi-

cations Commission (FCC) to promulgate the pricing and unbundling rules before us.

I

The FCC's pricing rules fall outside its delegated authority because both (1) a century of regulatory history establishes state authority as the local telephone service ratemaking norm and (2) the 1996 Act nowhere changes, or creates an exception to, that norm. JUSTICE THOMAS' opinion describes the history that has created the norm. *Ante*, at 402–404. In my view, the Act's purposes, its language, relevant precedent, and the nature of the FCC's rules provide added support for his conclusion.

A

The Act's purposes help explain why its language and structure foresee not national rate uniformity, but traditional local ratemaking—FCC views to the contrary notwithstanding. See *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* ¶ 113, 11 FCC Rcd 15499, 15558 (1996) (First Report & Order). To understand those purposes, one must recall that AT&T once dominated the national telecommunications industry. It controlled virtually all long-distance telephone service, most local telephone service, and a substantial amount of all telephone equipment manufacturing. See generally *United States* v. *American Tel. & Tel. Co.,* 552 F. Supp. 131, 165 (DC 1982) (describing AT&T's "commanding position" in the Nation's telecommunications business), aff'd *sub nom. Maryland* v. *United States,* 460 U. S. 1001 (1983). In 1982, however, AT&T entered into an antitrust consent decree, which ended its industry dominance. See 552 F. Supp., at 160–170.

The decree split AT&T from its local telephone service subsidiaries. By doing so, the decree sought to encourage new competition in long-distance service by firms such as MCI and Sprint. And it also encouraged new competition in telephone equipment markets. But the decree did not

introduce new competition into the local telephone service markets. Rather, it left each local market in the hands of a single state-regulated local service supplier, such as NYNEX in New York, or Bell Atlantic in Washington, D. C. That circumstance may have reflected the belief, current at the time, that local service competition could prove wasteful, leading to the unwarranted duplication of expensive physical facilities by requiring, say, the unnecessary digging up of city streets to install unneeded wires connecting each house with a series of new but redundant local switches. See, *e. g.*, *United States* v. *Western Elec. Co.*, 673 F. Supp. 525, 537–538 (DC 1987); P. Huber, M. Kellogg, & J. Thorne, The Geodesic Network II: 1993 Report on Competition in the Telephone Industry, pp. 2.3–2.5 (1992).

At the same time, the decree forbade most such local service suppliers from entering long-distance markets. *United States* v. *American Tel. & Tel. Co., supra*, at 186–188. That prohibition, by preventing entry by local firms willing and able to supply long-distance service, risked less long-distance competition. Cf. P. MacAvoy, The Failure of Antitrust and Regulation to Establish Competition in Long-Distance Telephone Services 179–183 (1996). But the decree reflected a countervailing concern. Local firms might enjoy special long-distance advantages not available to purely long-distance companies. See *United States* v. *American Tel. & Tel., supra*, at 186–188. Perhaps a local service company would find it unusually easy to attract local customers to its long-distance service; perhaps it could use its control of local service to place its long-distance competitors at a disadvantage. See T. Krattenmaker, Telecommunications Law and Policy 411–412 (2d ed. 1998) (explaining rationale of the decree). And though some argued that any such special advantages were innocent, rather like those enjoyed by a transcontinental airline that dominates a local hub, others claimed they were unfair, like those that had once helped AT&T (through its control of local service) maintain long-distance

dominance. See *United States* v. *American Tel. & Tel.*, *supra*, at 165; see generally A. Kahn, Letting Go: Deregulating the Process of Deregulation, or: Temptation of the Kleptocrats and the Political Economy of Regulatory Disingenuousness 37–38, and n. 53 (1998) (discussing the debate). Whether the decree's tradeoff made sense—*i. e.*, whether the existence of some such local-firm/long-distance-service advantage warranted the decree's prohibition limiting the number of potential long-distance competitors—became a fertile source for later argument. See, *e. g.*, MacAvoy, *supra*, at 171–177 (arguing that oligopolistic conditions in long-distance markets have produced supranormal profits that would not be sustainable with increased competition); Robinson, The Titanic Remembered: AT&T and the Changing World of Telecommunications, 5 Yale J. Reg. 517, 537 (1988) (arguing that the rationale for the decree's restrictions on local service companies was "just as persuasive" as that underlying the decree).

The Act before us responds to this argument by changing the postdecree status quo in two important ways. First, it creates a legal method through which local telephone service companies may enter long-distance markets, thereby providing additional long-distance competition. See 47 U. S. C. § 271(c)(2)(B) (1994 ed., Supp. II) (listing 14 conditions that, if met, permit incumbent local firms to enter long-distance market). Second, it conditions that long-distance entry upon either (1) the introduction of competition into local markets, *or* (2) the failure of a competing carrier to request access to or interconnection with the local service supplier (or the competing carrier's failure to engage in "good faith" negotiations). §§ 271(c)(1)(A), (B). The existence of these two alternatives is important. In setting forth the first alternative, actual local competition, the statute recognizes that local service competition would diminish any special long-distance advantages that the local firm has, thereby lessening the need for the decree's long-distance-market

entry prohibition. See *supra,* at 414–415; Krattenmaker, The Telecommunications Act of 1996, 49 Fed. Com. L. J. 1, 15–16 (1996). In setting forth the second alternative, the Act recognizes that actual local competition might not prove practical; in some places, to some extent, local markets may not support more than a single firm, at least not without wasteful duplication of resources. See Note, The FCC and the Telecom Act of 1996: Necessary Steps to Achieve Substantial Deregulation, 11 Harv. J. L. & Tech. 797, 810, n. 57 (1998).

These alternatives raise a difficult empirical question. To what extent is local competition possible without wasteful duplication of facilities? The Act does not purport to answer this question. Rather, it creates a set of legal rules which, through interaction with the marketplace, aims to produce sensible answers. In particular, the Act *permits* new local entry by dismantling existing legal barriers that would otherwise inhibit it. 47 U. S. C. § 253(a) (1994 ed., Supp. II). Equally important, the Act *promotes* new local entry by requiring incumbents (1) to "interconnect" with new entrants (thereby allowing even a partial new entrant's small set of subscribers to call others within an entire local area), § 251(c)(2); (2) to sell retail services to new entrants at wholesale rates (thereby allowing newly entering firms to become "resellers," competing in retailing), § 251(c)(4); and (3) to provide new entrants "access to network elements," say, house-to-street telephone lines, "on an unbundled basis" (thereby allowing new entry in respect to *some* aspects of the local service business without requiring wasteful duplication of the *entire* business), § 251(c)(3). The last mentioned "unbundling" requirement does not specifically state which elements must be unbundled, a difficult matter that I shall discuss below. See *infra,* at 427–431. But one can understand the basic logic of "unbundling" by imagining that Congress required a sole incumbent railroad providing service between City A and City B to share certain basic facilities, say, bridges, rights-of-way, or tracks, in order to avoid waste-

ful duplication of those hard-to-duplicate resources while facilitating competition in the *remaining* aspects of A-to-B railroad service. Indeed, one might characterize the Act's basic purpose as seeking to bring about, without inordinate waste, greater local service competition both as an end in local markets and as a means toward more competition, and fair competition, in long-distance markets.

For the present cases, the most important characteristic of the Act's purposes is what those purposes do *not* require. Those purposes neither require nor suggest reading the Act's language to change radically the scope of local regulators' traditional ratesetting powers. A utility's rate structure consists of complex sets of typically interdependent individual rates, the determination of which depends upon numerous considerations, many of which are local in nature and fall outside the Act's purview. The introduction of competition into a particular locality does not diminish the importance of place-specific factors, such as local history, geography, demands, and costs. And local regulators are likely more familiar than are national regulators, for example, with a particular utility's physical plant, its cost structure, the pattern of local demand, the history of local investment, and the need for recovery of undepreciated fixed costs.

Moreover, local regulators have experience setting rates that recover both the immediate, smaller, added costs that demand for additional service imposes upon a local system and also a proper share of the often huge fixed costs (of local loops, say, or switches) and overhead needed to provide the dial tone itself. Indeed, local regulators would seem as likely, if not more likely, than national regulators to know whether, when, or the extent to which particular local charges or systems of charges will lead new entrants to abandon efforts to use a local incumbent's elements, turning instead to alternative technologies. And local regulators would seem as likely as national regulators to know whether or when use of such alternative technologies in the local cir-

cumstances will prove more beneficial than wasteful. It is the local communities, and, hence, local regulators, that will directly confront the problems and enjoy the benefits associated with local efforts to integrate new and old communications resources and communications firms. These factors, along with the fact that the relevant technology changes rapidly, argue in favor of, not against, local ratesetting control, including local ratesetting differences, for those differences can amount to the kind of "experimentation" long thought a strength of our federal system.

At most, the Act's purposes argue for a grant to the FCC of authority to set federal limitations preventing States from adopting forms of ratemaking that would interfere with the Act's basic objectives. The Act explicitly grants the FCC a particular pre-emption tool, not here invoked, which is apparently suited to that job. 47 U.S.C. § 253(d) (1994 ed., Supp. II) (permitting the FCC to pre-empt, after notice and comment, any state legal requirement that has the effect of prohibiting entry into local service). Such a grant could not help the FCC here, however, for, as I discuss below, *infra*, at 423–427, the FCC's rules do not just create an outer envelope or simply prevent the States from going too far. Rather, they effectively supplant much of a local regulator's local ratesetting work.

### B

Read in light of its purposes, the Act's language more clearly foresees retention, not replacement, of the traditional allocation of state-federal ratesetting authority. *Ante,* at 405–406 (THOMAS, J., concurring in part and dissenting in part). Sections 251 and 252, which establish and provide for implementation of new local service obligations, contain the relevant language.

Section 251 lists basic obligations that the Act imposes upon local incumbents. These include obligations to interconnect, to unbundle, to sell at wholesale rates, to provide "number portability," to assure "dialing parity," to negotiate

with potential entrants in good faith, and generally to encourage local competition. Section 251 also refers to the FCC, but only in respect to *some* of these obligations. See, *e. g.*, § 251(d)(2) ("[T]he Commission shall consider" certain standards in determining which network elements must be unbundled); § 251(b)(2) (local firms have duty to provide "number portability in accordance with requirements prescribed by the Commission"); see *ante*, at 406 (THOMAS, J., concurring in part and dissenting in part). It makes no mention of a regulator in respect to other matters, *which others include ratemaking.* Thus, § 251's language leaves open the relevant question—which regulator has the authority to set rates.

Section 252, which specifically describes how § 251's obligations are to be implemented, is less ambivalent. Its implementation system consists of negotiation between incumbents and new entrants, followed by *state* regulatory commission arbitration if negotiations fail. §§ 252(a), (b). Certain of § 252's language, I concede, can be read to favor the majority—in particular its statement that the results of state arbitration must be consistent with § 251 and with "regulations prescribed by the [FCC] pursuant to section 251." § 252(c)(1). But the word "regulations" here might or might not include rate regulations. *Ante*, at 384–385. And the immediately following language indicates that it does not.

That immediately following language, beginning with the immediately subsequent subsection and including nine paragraphs, speaks separately, and specifically, of rates. §§ 252(c)(2), (d). And that language expressly says that the *"State commission[s]"* are to "establish any rates." It adds that they are to do so "according to" a further subsection, "subsection (d)." And this further subsection (d), headed by the words "Pricing standards" and focusing upon "charges," sets forth the pricing standards for use by the *state commissions.* It speaks of "[d]eterminations by a [s]tate commission of the just and reasonable rate" (which, it adds, must be

"nondiscriminatory" and "based on . . . cost"), but it says nothing about a role for the FCC. Section 252's references to the state commissions, its ratesetting detail, and its silence about the FCC's role all favor a reading of the earlier word "regulations" that excludes, rather than includes, FCC rate regulations.

Thus, §251 is silent about local ratesetting power. Section 252 speaks of state, not federal, ratemaking. As most naturally read, the structure and language of those sections foresee the traditional allocation of ratemaking authority— an allocation that within broad limits assumes local rates are local matters for local regulators.

I recognize that the majority finds the relevant rulemaking authority not in §§251 and 252, but in a different section containing a general grant of rulemaking authority. *Ante*, at 377–378 (citing 47 U. S. C. §201(b)). But Congress enacted that language in 1938, see 52 Stat. 588. The scope of the FCC's legal power to apply an explicit grant of general authority to make rules implementing the more specific terms of a later enacted statute depends upon what that later enacted statute contemplates. Cf. *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U. S. 355, 376–377, n. 5 (1986). And here, as just explained, the 1996 Act foresees the reservation of most local ratesetting authority to local regulators.

## C

The most the FCC can claim is linguistic ambiguity. But such a claim does not help the FCC, for relevant precedent makes clear that, when faced with ambiguity, we are to interpret statutes of this kind on the assumption that Congress intended to preserve local authority. See, *e. g., Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 518 (1992) ("presumption against the pre-emption of state police power regulations"); *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947) (requiring "clear and manifest" showing of congressional intent to supplant traditional state police powers). Moreover,

the Communications Act of 1934 itself, into which Congress inserted the provisions of the 1996 Act with which we are here concerned, comes equipped with a specific instruction that courts are *not* to "construe" the FCC's statutory grant of authority as

> "giv[ing] the Commission jurisdiction with respect to ... charges ... for or in connection with intrastate communication." 47 U. S. C. § 152(b).

Thus, as JUSTICE THOMAS points out, *ante*, at 409, it is not surprising to find that this Court has interpreted the Communications Act as denying the FCC authority to determine local rate-related practices in the face of statutory language far more helpful to the FCC than anything present here. *Louisiana Pub. Serv. Comm'n v. FCC, supra.* That precedent requires a similar result here.

*Louisiana* raised a question almost identical to the one before us: Does a statute granting the FCC authority to set certain *general* rate-related rules (there, depreciation rules) also grant the FCC authority to set *primarily local* rate-related rules (*i. e.*, local depreciation rules)? Writing for the Court, Justice Brennan stated that the basic "rule of statutory construction" contained in § 152(b) and just quoted above requires interpretations that favor the reservation of ratemaking authority to the States. *Id.*, at 373. Hence, the statute did not permit the FCC to write depreciation rules that would apply to equipment insofar as it was used for local service. *Ibid.*

Consider the similarities between *Louisiana* and the present cases. The relevant rules of statutory construction—the general and explicit presumptions favoring retention of local authority—are the same. See *id.*, at 369 (asking whether "Congress intended that federal regulation supersede state law" and citing *Rice v. Santa Fe Elevator Corp., supra*); 476 U. S., at 371–373 (relying on § 152(b)). The subject matter is highly similar—both cases involve the way in

which local rates will be set for equipment used for both intrastate and interstate calls. Compare Opening Brief for Federal Petitioners in No. 97–831, pp. 36–38, with *Louisiana, supra,* at 374–376. And both cases involve intrastate charges that could affect interstate rates, here because of local competition's interstate impact, see First Report & Order ¶ 84, 11 FCC Rcd, at 15544, in *Louisiana* because more (or less) stringent local depreciation rules would affect the rate of replacement of equipment used, for interstate calls, 476 U. S., at 362–363.

Consider, too, the differences. The language of the relevant statute here explicitly refers to *"State commission[s],"* which, it says, will "establish any rates." · 47 U. S. C. § 252(c)(2) (1994 ed., Supp. II) (emphasis added). The language of the relevant statute in *Louisiana,* by contrast, was far more easily read as granting the FCC the authority it sought. That statute said that the FCC would "prescribe" depreciation practices for the relevant local telephone companies, and it prohibited "any depreciation charges ... other than those prescribed by the [FCC]," § 220(b); it made it "unlawful ... to keep any other [depreciation] accounts ... than those so prescribed or ... approved" by the FCC, § 220(g); it ordered the FCC to hear from state commissions before establishing its own rules, § 220(i); and it authorized the FCC to exempt state-regulated companies from its depreciation rules, § 220(h). See 476 U. S., at 366–367. These differences, of course, make the argument for local ratemaking in these cases stronger, not weaker, than in *Louisiana.*

The majority says its view is "unaffected" by § 152(b). *Ante,* at 379. But Congress' apparently was not, for when it enacted the 1996 Act, it initially considered amending § 152(b) to make it inapplicable to the provisions that we here consider, thereby facilitating an interpretation, like the majority's, that would give the FCC the local ratesetting power it now seeks to exercise. See S. 652, 104th Cong., 1st Sess., § 101(c)(2) (1995); H. R. 1555, 104th Cong., 1st Sess.,

§ 101(e)(1) (1995). The final legislation, however, rejected that proposed language. See 47 U. S. C. § 152(b). It cannot be thought that Congress "intend[ed] *sub silentio* to enact statutory language that it ha[d] earlier discarded in favor of other language." *INS* v. *Cardoza-Fonseca,* 480 U. S. 421, 442–443 (1987) (internal quotation marks and citation omitted).

## D

The FCC's strongest argument, in my view, is that its rate rules do not actually supplant local ratesetting authority; they simply set forth limits, creating a kind of envelope marking the outer bounds of what would constitute a reasonable local ratesetting system. The majority may accept a version of this argument, for it says the FCC has prescribed a "requisite pricing methodology" that "no more prevents the States from establishing rates than do the statutory 'Pricing standards' set forth in § 252(d)." *Ante,* at 384. That, however, is not what the FCC has done.

The FCC's rate regulations are not at all like § 252(d)'s pricing standards. The statute sets forth those standards in general terms, using such words as "based on . . . cost," "nondiscriminatory," and "just and reasonable." Terms such as these give ratesetting commissions broad methodological leeway; they say little about the "method employed" to determine a particular rate. *FPC* v. *Hope Natural Gas Co.,* 320 U. S. 591, 602 (1944). The FCC's rules, on the other hand, are not general. The dozens of pages of text that set them forth are highly specific and highly detailed. See First Report & Order ¶¶ 672–715, *supra,* at 15844–15862. They deprive state commissions of methodological leeway. Their ratesetting instructions grant a state commission little or no freedom to choose among reasonable rate-determining methods according to the State's policy-related judgments, assessing local economic circumstance or community need. I grant the fact that the rules leave it to the state commissions to fix the actual rate, but that is rather like giving a restaurant

chef the authority to choose a menu while restricting him to one dish, an omelette, and to one single favorite recipe.

Nor can the FCC successfully argue that the Act requires the particular ratesetting system that its regulations contain. The FCC's system, which the FCC calls "forward-looking," bases the charge for the use of an unbundled element (say, a set of local wires connecting a subscriber to a local switch) upon a hypothetical set of costs—the costs of providing that service using the incumbent's actual wire center, but otherwise assuming use of the most efficient technology that the incumbent *could* use (not the equipment the incumbent actually *does* use). See First Report & Order ¶¶ 682, 685, *supra*, at 15847–15849. The FCC does not claim that the statute's language (though ruling out certain kinds of rate-of-return proceedings, 47 U. S. C. § 252(d)(1)(A)(i) (1994 ed., Supp. II)) forces use of this forward-looking cost determination system. Moreover, I have explained above why I do not believe the Act's purposes demand what its language denies, namely, a single nationwide ratesetting system. *Supra*, at 417–418; cf. First Report & Order ¶ 114, 11 FCC Rcd, at 15558–15559 (arguing that a single pricing methodology is needed to assure uniform administration of the Act).

The FCC does argue that the Act's purpose, competition, favors its system. For competition, according to the FCC, tends to produce prices that reflect forward-looking replacement costs, not actual historical costs. *E. g., id.*, ¶ 672, 11 FCC Rcd, at 15844. But this argument does not show that the Act compels the use of the FCC's system over any other. How could it? The competition that the Act seeks is a process, not an end result; and a regulatory system that imposes through administrative mandate a set of prices that tries to mimic those that competition would have set does not thereby become any the less a regulatory process, nor any the more a competitive one.

Most importantly, the FCC's rules embody not an effort to circumscribe the realm of the reasonable, but rather a

policy-oriented effort to choose among several different systems, including systems based upon actual costs or price caps, which other systems the FCC's rules prohibit. A few examples, focusing upon some of the claimed weaknesses of the FCC's preferred system, will illustrate, however, how easily a regulator weighing certain policy considerations (for example, administrative considerations) differently might have chosen a different set of reasonable rules:

—Consider the FCC's decision to deny state commissions the choice of establishing rates based on actual historic, rather than hypothetical forward-looking, costs. See *id.*, ¶ 705, 11 FCC Rcd, at 15857–15858. Justice Brandeis, joined by Justice Holmes, pointed out the drawback of using a forward-looking, rather than an actual historic, cost system many years ago. He wrote that whatever the theoretical economic merits of a "reproduction cost" system (a system bearing an uncanny resemblance to the FCC's choice), the hypothetical nature of the regulatory judgments it required made such a system administratively unworkable. See *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Serv. Comm'n of Mo.*, 262 U. S. 276, 292–296 (1923) (dissenting opinion).

The passage of time has not outdated the Brandeis and Holmes criticism. Modern critics question whether regulators can accurately determine the "efficient" cost of supplying telephone service, say, to a particular group of Manhattan office buildings, by means of hypothetically efficient up-to-date equipment connected to a hypothetically efficient New York City network built to connect with NYNEX's existing (nonhypothetical) wire center. See, *e. g.,* Kahn, Letting Go, at 93, and n. 135. The use of historic costs draws added support from one major statutory aim—expeditious introduction of competition. That is because efforts to determine hypothetical (rather than actual) costs means argument, and argument means delay, with respect to entry into both local and long-distance markets. See *supra,* at 415–416. Though

the FCC disfavors actual or historic costs, it does not satisfactorily explain why their use would be arbitrary or unreasonable.

—Consider the FCC's decision to prohibit use of an "efficient component pricing rule." See First Report & Order ¶ 708–711, *supra,* at 15859–15860. Where an incumbent supplies an element to New Entrant B that it otherwise would have provided Old Customer A, that rule, roughly speaking, permits the incumbent to charge a price measured by either (1) the element's market price, if it is sold in the marketplace, or (2), if it is not, the incumbent's actual costs (including the net revenue the incumbent loses from forgoing the sale to Old Customer A). See generally, *e. g.,* W. Baumol & J. Sidak, Toward Competition in Local Telephony 95–97 (1994). This pricing system seeks to assure the incumbent that it will obtain from B the contribution, say, to fixed costs or to overhead, that A had previously made. Many experts prefer such a system. See, *e. g.,* Sidak & Spulber, The Tragedy of the Telecommons: Government Pricing of Unbundled Network Elements Under the Telecommunications Act of 1996, 97 Colum. L. Rev. 1081, 1111–1113, and nn. 75–85 (1997); Kahn & Taylor, The Pricing of Inputs Sold to Competitors: A Comment, 11 Yale J. Reg. 225, 228–230 (1994). The FCC rejected that system, but in doing so it did not claim, nor did its reasoning support the claim, that the use of such a system would be arbitrary or unreasonable. See Sidak & Spulber, *supra,* at 1095–1098.

—Consider the FCC's decision to forbid the use of what regulators call "Ramsey pricing," see First Report & Order ¶ 696, *supra,* at 15852–15853. Ramsey pricing is a classical regulatory pricing system that assigns fixed costs in a way that helps maintain services for customers who cannot (or will not) pay higher prices. See generally, *e. g.,* 1 A. Kahn, The Economics of Regulation: Principles and Institutions 137–141 (reprint 1988). Many experts strongly prefer the use of such a system. See, *e. g.,* Sidak & Spulber, *supra,* at

1109 (arguing that the FCC's prohibition of Ramsey pricing will "minimize rather than maximize consumer welfare"). The FCC disfavors Ramsey pricing, but it does not explain why a contrary judgment would conflict with the statute or otherwise be arbitrary or unreasonable.

These examples do not show that the FCC's rules themselves are unreasonable. That question is not now before us, and I express no view on the matter. The examples simply help explain why the FCC's rules could not set forth the *only* ratesetting system consistent with the Act's objectives. The FCC's regulations do not set forth an outer envelope surrounding a set of reasonable choices; instead, they constitute the kind of detailed policy-related ratesetting that the statute in respect to local matters leaves to the States.

\* \* \*

Two Terms ago the Court held that Congress could not constitutionally require a state sheriff to fill out a form providing background information about a buyer of a gun. *Printz* v. *United States*, 521 U. S. 898, 935 (1997). Dissenters in that case noted that the law deprived the States of a power that had little practical significance. See *id.*, at 961 (opinion of STEVENS, J.); *id.*, at 977 (opinion of BREYER, J.). Today's decision does deprive the States of practically significant power, a camel compared with *Printz*'s gnat. The language of the statute nowhere reveals any "clear and manifest purpose," *Rice*, 331 U. S., at 230, that such was Congress' intent. History, purpose, and precedent all argue to the contrary. I would hold that, in respect to local ratesetting, the FCC's reach has exceeded its legal grasp.

## II

I agree with the Court's disposition of the FCC's "unbundling" rules. As earlier explained, the Act seeks to introduce competition into local markets by removing legal barriers to new entry, by requiring interconnection, by re-

quiring incumbents to sell to potential retail competitors at wholesale rates, and by requiring the sharing, or "unbundling," of certain facilities. *Supra*, at 416; see 47 U. S. C. §§ 251(c)(2)–(4), 253(a) (1994 ed., Supp. II). The Act expresses this last-mentioned sharing requirement in general terms, reflecting congressional uncertainty about the extent to which compelled use of an incumbent's facilities will prove necessary to avoid waste. Will wireless technology or cable television lines, for example, permit the efficient provision of local telephone service without the use of existing telephone lines that now run house to house?

Despite the empirical uncertainties, the basic congressional objective is reasonably clear. The unbundling requirement seeks to facilitate the introduction of competition where practical, *i. e.*, without inordinate waste. *Supra*, at 416–417. And although the provision describing which elements must be unbundled does not explicitly refer to the analogous "essential facilities" doctrine (an antitrust doctrine that this Court has never adopted), the Act, in my view, does impose related limits upon the FCC's power to compel unbundling. In particular, I believe that, given the Act's basic purpose, it requires a convincing explanation of why facilities should be shared (or "unbundled") where a new entrant could compete effectively without the facility, or where practical alternatives to that facility are available. § 251(d)(2); see generally Areeda, Essential Facilities: An Epithet in Need of Limiting Principles, 58 Antitrust L. J. 841, 852–853 (1989).

As the majority points out, the Act's language itself suggests some such limits. *Ante*, at 387–392. The fact that compulsory sharing can have significant administrative and social costs inconsistent with the Act's purposes suggests the same. Even the simplest kind of compelled sharing, say, requiring a railroad to share bridges, tunnels, or track, means that someone must oversee the terms and conditions of that sharing. Moreover, a sharing requirement may diminish the original owner's incentive to keep up or to improve the prop-

erty by depriving the owner of the fruits of value-creating investment, research, or labor. And as one moves beyond the sharing of readily separable and administrable physical facilities, say, to the sharing of research facilities, firm management, or technical capacities, these problems can become more severe. One would not ordinarily believe it practical, for example, to require a railroad to share its locomotives, fuel, or work force. Nor can one guarantee that firms will undertake the investment necessary to produce complex technological innovations knowing that any competitive advantage deriving from those innovations will be dissipated by the sharing requirement. The more complex the facilities, the more central their relation to the firm's managerial responsibilities, the more extensive the sharing demanded, the more likely these costs will become serious. See generally 1 H. Demsetz, Ownership, Control, and the Firm: The Organization of Economic Activity 207 (1988). And the more serious they become, the more likely they will offset any economic or competitive gain that a sharing requirement might otherwise provide. The greater the administrative burden, for example, the more the need for complex proceedings, the very existence of which means delay, which in turn can impede the entry into long-distance markets that the Act foresees. See *supra*, at 415.

Nor are any added costs imposed by more extensive unbundling requirements necessarily offset by the added potential for competition. Increased sharing by itself does not automatically mean increased competition. It is in the *un*-shared, not in the shared, portions of the enterprise that meaningful competition would likely emerge. Rules that force firms to share *every* resource or element of a business would create not competition, but pervasive regulation, for the regulators, not the marketplace, would set the relevant terms.

The upshot, in my view, is that the statute's unbundling requirements, read in light of the Act's basic purposes, re-

quire balance. Regulatory rules that go too far, expanding the definition of what must be shared beyond that which is essential to that which merely proves advantageous to a single competitor, risk costs that, in terms of the Act's objectives, may make the game not worth the candle.

I believe the FCC's present unbundling rules are unlawful because they do not sufficiently reflect or explore this other side of the unbundling coin. See *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.,* 463 U. S. 29, 43 (1983). They do not explain satisfactorily why, for example, an incumbent must share with new entrants "call waiting," or various operator services. Nor do they adequately explain why an incumbent should be forced to share virtually every aspect of its business. As the majority points out, *ante,* at 389–390, they seem to assume, without convincing explanation, that the more the incumbent unbundles, the better. Were that the Act's objective, however, would Congress have seen a need for a separate wholesale sales requirement (since the "unbundling" requirement would have led to a similar result)? Indeed, would Congress have so emphasized the importance of competition? A totally unbundled world—a world in which competitors share every part of an incumbent's existing system, including, say, billing, advertising, sales staff, and work force (and in which regulators set all unbundling charges)—is a world in which competitors would have little, if anything, to compete about.

I understand the difficulty of making the judgments that the statute entrusts to the FCC and the short time that it gave the FCC in which to make them. 47 U. S. C. § 251(d)(1) (1994 ed., Supp. II). I also understand that the law gives the FCC considerable leeway in the exercise of its judgment. *E. g.,* R. Pierce, S. Shapiro, & P. Verkuil, Administrative Law and Process § 7.4, p. 353 (2d ed. 1992). But, without added explanation, I must conclude that the unbundling rules before us go too far. They are inconsistent with Congress' ap-

proach. They have not been adequately justified in terms of the statute's mandate, read in light of its purposes. See 5 U. S. C. § 706(2). For this reason, as well as the reasons set forth in the majority's opinion, I agree with its conclusion that Rule 319 must be vacated.