**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NORTH COUNTY COMMUNICATIONS CORPORATION OF ARIZONA, a California corporation, *Plaintiff-Appellant*, <br><br> v. <br><br> QWEST CORPORATION, a Colorado corporation, DBA CenturyLink QC; GARY PIERCE; BOB STUMP; SANDRA KENNEDY; PAUL NEWMAN; BRENDA BURNS, in their official capacity as Commissioners of the Arizona Corporation Commission, *Defendants-Appellees*. | No. 14-15115 <br><br> D.C. No. 2:13-cv-00466-DGC |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

NORTH COUNTY
COMMUNICATIONS
CORPORATION OF OREGON, a
California corporation,
            *Plaintiff-Appellant*,

                v.

QWEST CORPORATION, DBA
CenturyLink QC, a Colorado
corporation; JOHN SAVAGE;
SUSAN ACKERMAN; STEPHEN
BLOOM, in their capacity as
Commissioners of the Public
Utility Commission of Oregon,
            *Defendants-Appellees.*

No. 14-35254

D.C. No.
3:13-cv-00375-BR

OPINION

Appeal from the United States District Court
for the District of Oregon,
Anna Brown, District Judge, Presiding

Argued and Submitted December 8, 2015
San Francisco, California

Filed May 31, 2016

Before: Diarmuid F. O'Scannlain, Barry G. Silverman,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain

# SUMMARY[*]

## Telecommunications Act

The panel affirmed two district courts' summary judgments in favor of Qwest Corporation and two state regulatory commissions in actions brought under the Telecommunications Act of 1996 by local exchange carriers that provide telecommunications services to their customers in Arizona and Oregon.

The plaintiffs sued Qwest Corp., a rival local exchange carrier, and the commissioners of the Arizona Corporation Commission and the Public Utility Commission of Oregon, state agencies whose responsibilities include regulating contracts between local exchange carriers. Qwest is an incumbent local exchange carrier (ILEC), which previously enjoyed a monopoly on local phone service, and North County is a competitive local exchange carrier (CLEC).

North County requested to interconnect with Qwest, and the parties entered into interconnection agreements in 1997. They subsequently entered into unsuccessful negotiations for successor agreements, and Qwest petitioned for arbitration before the state Commissions. The Commissions held arbitration hearings and approved new interconnection agreements in 2011.

Qwest argued that the Commissions had authority to arbitrate the 2011 agreements because Qwest had the power

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

under 47 U.S.C. § 252 to initiate negotiations with North County to replace their existing interconnection agreements and thereafter to force North County into binding arbitration. Qwest relied on the FCC's Triennial Review Order, which states that either a CLEC or an ILEC may initiate negotiations. Qwest also argued that the language of the initial interconnection agreements authorized it to initiate negotiations. The panel held that the state Commissions had authority to arbitrate the 2011 agreements because the 1997 agreements gave Qwest both the power to initiate negotiations and the power to compel arbitration.

The panel rejected North County's challenges to six specific provisions of the 2011 interconnection agreements: (1) the requirement that North County interconnect with Qwest directly rather than through a third-party tandem provider; (2) the agreements' "Relative Use Factor;" (3) the requirement that North County use digital signaling technology known as SS7 signaling if and when it originates calls to Qwest; (4) the requirement that North County pay Qwest for certain call detail records; (5) the cap on the number of minutes for which North County can bill Qwest; and (6) the agreements' failure to allow North County to interconnect using Voice over Internet Protocol.

---

## COUNSEL

R. Dale Dixon, Jr., Law Offices of Dale Dixon, Del Mar, California, argued the cause and filed the briefs for the plaintiff-appellant.

Lawrence H. Reichman, Perkins Coie LLP, Portland, Oregon, argued the cause and filed the brief for the defendant-appellee Qwest Corporation.

Maureen A. Scott, Arizona Corporation Commission, Phoenix, Arizona, argued the cause and filed the brief for the defendants-appellees Gary Pierce, Bob Stump, Sandra Kennedy, Paul Newman, and Brenda Burns, in their capacity as Commissioners of the Arizona Corporation Commission. With her on the brief were Brian E. Smith and Robert W. Geake, Arizona Corporation Commission, Phoenix, Arizona.

Ellen F. Rosenblum, Attorney General, Salem Oregon; Anna M. Joyce, Solicitor General, Salem Oregon; and Michael T. Weirich, Senior Assistant Attorney General, Salem, Oregon, together filed the brief for the defendants-appellees John Savage, Susan Ackerman, and Stephen Bloom, in their capacity as Commissioners of the Public Utility Commission of Oregon.

**OPINION**

O'SCANNLAIN, Circuit Judge:

This dispute under the Telecommunications Act of 1996 pits one telephone company against another with two state regulatory Commissions caught in the middle. We must determine whether the matter is subject to binding arbitration, and, if so, what rules apply.

I

These appeals involve two consolidated cases, one from the District of Arizona, the other from the District of Oregon. The lawsuits were brought by North County Communications Corporation of Arizona and North County Communications Corporation of Oregon (collectively referred to as "North County," except when necessary to distinguish one from the other). North County is a local exchange carrier that provides telecommunications services to its customers. North County sued Qwest Corporation, a rival local exchange carrier, and, in their official capacities, commissioners of two state Commissions—the Arizona Corporation Commission ("Arizona Commission") and the Public Utility Commission of Oregon ("Oregon Commission")—state agencies whose responsibilities include regulating contracts between such carriers.

A

As many courts have explained, Congress passed the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of chapter 47 of the United States Code) (the "Act"), to promote

competition in the provision of telecommunication services. *See, e.g.*, *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 370–72 (1999). As relevant here, the statute classifies local exchange carriers into two categories: incumbent local exchange carriers (ILECs), and competitive local exchange carriers (CLECs). *Quick Commc'ns, Inc. v. Mich. Bell Tel. Co.*, 515 F.3d 581, 583 (6th Cir. 2008). ILECs are those entities that enjoyed a monopoly on local phone service in a particular geographic area prior to the Act. *Id.* For both the Arizona and Oregon cases, Qwest is an ILEC, and North County is a CLEC.

1

The Act subjects ILECs "to a host of duties intended to facilitate market entry. Foremost among these duties is the [incumbent local exchange carrier's] obligation under 47 U.S.C. § 251(c) . . . to share its network with competitors." *AT&T Corp.*, 525 U.S. at 371. Doing so ensures that the CLEC's customers can call the ILEC's customers, and vice versa. Under the Act, a CLEC may access an ILEC's network by requesting to interconnect its facilities with the ILEC's network. *Id.*; *see also* 47 U.S.C. § 252(a).

2

Section 252(a) of the Act declares that "[u]pon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier." 47 U.S.C. § 252(a)(1). Section 252(b) then provides that "[d]uring the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local

exchange carrier receives a request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues." 47 U.S.C. § 252(b)(1). Section 252(e) states that "[a]ny interconnection agreement ["ICA"] adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies." 47 U.S.C. § 252(e)(1).

B

In 1997, North County first requested to interconnect with Qwest in Arizona and Oregon. One provision of the resulting agreement ("1997 ICA") between Qwest and North County, section XXXIV(V), stated:

> This Agreement shall be effective for a period of 2 1/2 years, and thereafter the Agreement shall continue in force and effect unless and until a new agreement, addressing all of the terms of this Agreement, becomes effective between the Parties. The Parties agree to commence negotiations on a new agreement no later than two years after this Agreement becomes effective.

Notwithstanding this provision, no new ICAs had been entered into until the events which gave rise to this dispute.

1

At the time Qwest and North County first interconnected, the telecommunications industry was undergoing a transition

from analog signaling technology, known as MF signaling, to digital signaling technology, known as SS7 signaling. These signaling technologies are important because they transmit information with a call as the call crosses a carrier's system. Much of this information is necessary for local carriers to know so that they can properly bill one another for the costs generated by transmitting calls between their networks. Unsurprisingly, SS7 signaling has many advantages over MF signaling: it is more efficient, more flexible, and more reliable, and it has a greater capacity to track and to record information relevant for billing purposes.

2

Central to the parties' dispute is the fact that North County continues to use the increasingly outdated MF signaling to exchange local traffic with Qwest. (From the record, it appears that every other CLEC that interconnects with Qwest uses SS7 signaling to exchange local traffic.) That choice has important consequences when it comes to billing. In particular, North County is entitled to bill Qwest for some of the local traffic that Qwest sends to it when telephone users on Qwest's network call users on North County's network, but North County's reliance on MF technology makes it difficult for Qwest to verify the accuracy of the bills North County sends over. At the same time, North County does not currently send much traffic to Qwest—in Arizona, for instance, North County primarily provides telephone services to businesses that take incoming calls, but does not transmit outbound calls. If, however, North County were to begin sending traffic to Qwest via MF signaling using a third-party service provider, Qwest would be unable to identify and measure the traffic being routed from North County's network to Qwest's.

C

In 2008, Qwest suspected that North County was overbilling it. Qwest, spurred on by the billing dispute, requested North County to negotiate successor ICAs in Arizona and Oregon. North County agreed to enter into negotiations, which lasted more than a year. Importantly, during that time North County "agreed to a series of extensions of the arbitration window to file a petition for arbitration under 47 U.S.C. § 252(b) . . . . In each of the extension agreements dated January 16, 2009, February 9, 2009, April 29, 2009, and May 29, 2009, [North County] specifically agreed to extend 'the period during which *either party* may file for arbitration under section 252(b)(l) of the Act.'" (emphasis added). The negotiations ultimately were not successful.

1

On August 3, 2009, Qwest petitioned for arbitration in both Arizona and Oregon. North County raised a number of objections. First, North County moved each state Commission to dismiss Qwest's petition for arbitration, arguing that § 252 did not give the Commissions authority to arbitrate new ICAs because Qwest, not North County, had requested the underlying negotiations. Both state Commissions denied North County's motions to dismiss. In 2011 the Arizona Commission and the Oregon Commission each approved a new ICA ("2011 ICAs") based on the results of the arbitration hearings.

2

North County then sought declaratory and injunctive relief in federal district court in Arizona and Oregon. North County argued that the 2011 ICAs must be declared "void *ab initio*" because, North County reiterated, the state Commissions lacked authority to arbitrate them. The district courts rejected this argument, although they accepted North County's characterization that the relevant negotiations had been requested and initiated by Qwest. The Arizona district court noted that "[n]o court has directly considered whether the language of sections 252(a)(1) and (b)(1) applies to requests to negotiate made by ILECs to CLECs." Despite agreeing that the text of the Act supported North County—and only North County—the district courts reasoned that a literal interpretation would be unacceptable because it would frustrate the Act's two main purposes, which the district courts said were to "encourage competition in the telecommunications industry by requiring the good faith negotiation of ICAs by ILECs and CLECs," and to give state Commissions a prominent role in overseeing negotiated ICAs. North County also challenged a number of the 2011 ICAs' specific provisions, which the district courts likewise rejected across the board.

Each district court granted summary judgment to Qwest. North County timely appealed in both cases.

II

We review a district court's grant of summary judgment de novo. *Verizon Cal., Inc. v. Peevey*, 462 F.3d 1142, 1150 (9th Cir. 2006). In addition, we review de novo whether arbitrated ICAs are in compliance with Telecommunications

Act and its implementing regulations. *Id.* "[W]e review all other issues under an arbitrary and capricious standard." *U.S. W. Commc'ns, Inc. v. Wash. Utils. & Transp. Comm'n*, 255 F.3d 990, 994 (9th Cir. 2001). "A state commission's decision is arbitrary and capricious if the decision 'was not supported by substantial evidence,' or the commission made a 'clear error of judgment.'" *Peevey*, 462 F.3d at 1150 (quoting *Pac. Bell v. Pac W. Telecomm, Inc.*, 325 F.3d 1114, 1131 (9th Cir. 2003)).

III

North County first contends that the state Commissions lacked authority to arbitrate the 2011 ICAs. Qwest does not dispute North County's premise that Qwest initiated the relevant negotiations. Hence, the question is whether Qwest, upon deciding it wanted to scrap the existing ICAs and replace them with a pair of new ones, had the power to initiate negotiations with North County and thereafter to force North County into binding arbitration. If Qwest lacked such power, North County contends, then the state Commissions had no authority to resolve the parties' disagreements.

A

Qwest responds to North County's argument by urging that 47 U.S.C. § 252 authorized it to request negotiations with North County to replace their existing ICAs and to petition for binding arbitration when those negotiations hit a snag. Aside from the district courts here, however, it appears that no federal court has directly ruled on whether § 252, of its own force, empowers an ILEC like Qwest to initiate negotiations with a CLEC and thereafter to force the CLEC into arbitration if the negotiations fail.

The relevant statutory text does not appear hospitable to the reading Qwest proposes. Specifically, § 252(a)(1), concerning "[v]oluntary negotiations," states that "*[u]pon receiving a request* for interconnection, services or network elements pursuant to section 251 of this title, an [ILEC] may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers." 47 U.S.C. § 252(a)(l) (emphasis added). Section 252(b)(l) then declares that "[d]uring the period from the 135th to the 160th day (inclusive) after the date *on which an [ILEC] receives a request for negotiation* under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues." 47 U.S.C. § 252(b)(1) (emphasis added).

As all parties acknowledge, both sections refer only to situations where an ILEC receives a request for interconnection or negotiation. The statute does not mention requests for negotiations initiated by an ILEC or mutually agreed upon by the two carriers. And as everyone also agrees, in this case, the relevant negotiations—the ones that led to the 2011 ICAs—were requested by Qwest, not North County. That circumstance, says North County, means that the Telecommunications Act could not have functioned as the source of any power in Qwest to compel arbitration.

1

Qwest responds in two basic ways. The first—and potentially most devastating—is that the FCC has definitively interpreted the relevant statutory provision and that such interpretation governs the situation here. Qwest's argument depends on a footnote in a 2003 FCC order—called the Triennial Review Order ("TRO")—in which the FCC stated

that "[a]lthough section 252(a)(1) and section 252(b)(1) refer to requests that are made *to* incumbent LECs, we find that in the interconnection amendment context, either the incumbent or the competitive LEC may make such a request." *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 F.C.C.R. 16978, 17405 ¶ 703 n.2087 (2003), *vacated in part and remanded*, *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 594 (D.C. Cir. 2004). Qwest asserts that the just-quoted language establishes that Qwest had the power to compel arbitration in this case, after it requested North County to negotiate successor ICAs and those negotiations reached an impasse. Furthermore, Qwest maintains that the Hobbs Act, 28 U.S.C. § 2342, forbids us from reviewing the FCC's interpretation.[1]

---

[1] The Hobbs Act states, in relevant part: "The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47. . . . Jurisdiction is invoked by filing a petition as provided by section 2344 of this title." 28 U.S.C. § 2342. As we have explained, "[u]nder the Hobbs Act, this court lacks jurisdiction to rule on a collateral attack of an FCC order. . . . 'Properly promulgated FCC regulations currently in effect must be presumed valid for the purposes of this appeal. The Hobbs Act, 28 U.S.C. § 2342, requires that all challenges to the validity of final orders of the FCC be brought by original petition in a court of appeals. The district court thus lacked jurisdiction to pass on the validity of the FCC regulations, and no question as to their validity can be before us in this appeal.'" *Pac. Bell Tel. Co. v. Cal. Pub. Utils. Comm'n*, 621 F.3d 836, 843 n.10 (9th Cir. 2010) (quoting *U.S. W. Commc'ns, Inc. v. Jennings*, 304 F.3d 950, 958 n.2 (9th Cir. 2002)). If the Hobbs Act applies here, then even if we were to "doubt the soundness of the FCC's interpretation" of § 252, we would "not [be] at liberty to review that interpretation." *U.S. W. Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1055 (9th Cir. 2000).

Naturally, the strength of Qwest's Hobbs Act argument depends on whether the TRO actually addresses the scenario that transpired here; if it does not, we could not say that North County's attack on Qwest is also an attack on the FCC order, because the validity of the TRO would simply not be drawn into question at all. Qwest's Hobbs Act argument would therefore be neutralized. This question may be close, and it is certainly complicated—giving footnote number 2,087 its proper reading in the context of the surrounding 659-page FCC order is no simple task.[2]

2

Second, in addition to relying on the TRO, Qwest defends its preferred reading of § 252 on the merits by invoking the traditional tools of statutory construction, above all by emphasizing the statute's supposed purposes and the need to avoid results Qwest deems absurd. As noted, Qwest's position is in some tension with the text of § 252, and we are aware of no federal court to have read the statute in the way Qwest proposes.

---

[2] No party has cited any authority construing the scope of the FCC's ruling in the TRO, which by its own terms purported to apply only "in the interconnection amendment context." *TRO*, at 19023 n.2087. Nonetheless, we need not resolve today whether the statutory text of section 252(b)(1), as interpreted by the FCC, authorizes Qwest to commence negotiations for *new* interconnection agreements and then to compel arbitration before the State commissions when those negotiations stall. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1030 (9th Cir. 2013) (Bea, J., concurring in part and dissenting in part) ("[T]he 'cardinal principle of judicial restraint' is that 'if it is not necessary to decide more, it is necessary not to decide more.'" (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))). Here, an independent source—the parties' own contract—gives Qwest the authority to compel arbitration.

B

We may not need to decide whether § 252(b)(1) on its own gave Qwest the power to commence negotiations over the 2011 ICAs and then to force North County into arbitration, because even if the statute did *not* grant Qwest such power, that would not inevitably mean Qwest lacked such power; Qwest would just have to trace such power to a different source.

1

But what about the 1997 ICAs themselves, which, as private agreements, are capable of defining the parties' rights and obligations like any other contracts?[3]  As we have explained, "[o]nce the terms [of an ICA] are set, either by agreement or arbitration, and the state commission approves the agreement, it becomes a binding contract." *Pac. Bell*, 325 F.3d at 1120; *see also CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) ("[A]n ICA is a private agreement," which courts must interpret "[l]ike any other contract."); *TRO* at 17404 ¶ 701 ("Permitting voluntary

---

[3] Even if we assume North County is right that § 252 on its own would not have authorized the state Commissions to arbitrate the 2011 ICAs, North County nowhere suggests that this limitation is "jurisdictional," in the sense that the parties would lack the freedom to vary such rule by contract.  Nor would we readily credit such argument, had it been made. *See, e.g.*, *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013) ("To ward off profligate use of the term 'jurisdiction,' we have adopted a 'readily administrable bright line' for determining whether to classify a statutory limitation as jurisdictional.  We inquire whether Congress has 'clearly state[d]' that the rule is jurisdictional; absent such a clear statement, we have cautioned, 'courts should treat the restriction as nonjurisdictional in character.'") (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006)) (internal citation omitted).

negotiations for binding interconnection agreements is the very essence of section 251 and section 252."). As such, we have held that "the agreements themselves and state law principles govern the questions of interpretation of the [ICAs] and enforcement of their provisions." *Pac. Bell*, 325 F.3d at 1128 (quoting *Sw. Bell Tel. v. Pub. Util. Comm'n*, 208 F.3d 475, 485 (5th Cir. 2000)).

Qwest relies heavily on Section XXXIV(V) of the 1997 ICAs. As we noted at the outset of this opinion, Section XXXIV(V) stated:

> This Agreement shall be effective for a period of 2 1/2 years, and thereafter the Agreement shall continue in force and effect unless and until a new agreement, addressing all of the terms of this Agreement, becomes effective between the Parties. The Parties agree to commence negotiations on a new agreement no later than two years after this Agreement becomes effective.

Qwest's position is that Section XXXIV(V) not only gives each party the power to initiate negotiations, but also gives each party the power to achieve a "new agreement" by compelling arbitration before the state Commissions if those negotiations fail to resolve all of the parties' disputes. In effect, Qwest interprets Section XXXIV(V) to make reciprocal what would otherwise be a unilateral power to invoke the § 252 negotiation-and-arbitration process. Both

state Commissions agreed with Qwest's interpretation of the 1997 ICAs.**[4]**

We agree as well, and we therefore conclude for the following reasons that the state Commissions had authority to arbitrate the 2011 ICAs because the 1997 ICAs themselves gave Qwest both the power to initiate negotiations and the power to compel arbitration.

2

In the first place, North County's briefing before this court does not address the argument that the 1997 ICAs authorized Qwest to compel arbitration. Given that North County is a party to the contract, its silence is damning. So, too, is the course of conduct North County engaged in during the period before Qwest petitioned for arbitration. As the parties explained in the Joint Statement of Agreed Facts, filed with the district court in the Oregon proceeding below, "[North County] and [Qwest] agreed to a series of extensions of the arbitration window to file a petition for arbitration under 47 U.S.C. § 252(b) . . . . In each of the extension agreements . . . [North County] specifically agreed to extend 'the period during which *either party may file for arbitration*

---

**[4]** The Oregon Commission held that "[b]y the terms of the parties' existing ICA, either Qwest or North County may commence negotiations under Section 252(a)(l) of the Act, and if negotiations fail, either party may then petition this Commission to arbitrate any open issues under Section 252(b)(1) of the Act." Likewise, the Arizona Commission held that "the Commission clearly has the authority to arbitrate disputes arising during the renegotiation of an ICA between Qwest and a CLEC," based, in part, on "the fact that under the ICA, both parties have the right to commence negotiation of a new agreement," and the fact "that Qwest met the procedural requirements under the ICA."

*under section 252(b)(1)* of the Act.'" In addition, in January 2010 North County agreed to set a date for arbitration. North County does not argue that it took any of these actions under a reservation of rights or the like.

North County's behavior under the 1997 ICAs is highly probative of those ICAs' meaning. *See, e.g.*, *Abrams v. Horizon Corp.*, 669 P.2d 51, 57 (Ariz. 1983) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." (quoting Restatement (Second) of Contracts § 202(4) (1979) (emphasis deleted)); *Tarlow v. Arntson*, 505 P.2d 338, 341–42 (Or. 1973) (en banc) ("How the original parties and their successors conducted themselves in relation to the agreement is instructive in our determination of what must have been intended."). To be sure, North County *later* objected to the state Commissions' authority to arbitrate. But its failure to do so at any point during the lengthy period of time leading up to litigation casts doubt on whether its current position reflects the proper reading of the 1997 ICAs. Further, one might be able to argue that the 1997 ICAs, read as a whole, give Qwest only the power to request negotiations, but not the additional power to force arbitration. But North County has not attempted to advance such argument here.

3

In sum, given (1) the language of the 1997 ICAs' negotiation clause and the way it was interpreted by both state Commissions below; (2) North County's conduct in the time

leading up to the arbitration proceedings; and (3) North County's lack of any rebuttal argument before this court; we are satisfied that the state Commissions had authority to arbitrate the 2011 ICAs because the 1997 ICAs themselves gave Qwest the power to invoke the negotiation-and-arbitration mechanism set forth in 47 U.S.C. § 252.

IV

North County next challenges six specific provisions of the 2011 ICAs themselves: (1) the requirement that North County interconnect with Qwest directly rather than through a third-party tandem provider; (2) the ICAs' Relative Use Factor; (3) the requirement that North County employ SS7 signaling if and when it originates calls to Qwest; (4) the requirement that North County pay Qwest for certain call detail records; (5) the cap on the number of minutes for which North County can bill Qwest; and (6) the ICAs' failure to allow North County to interconnect using Voice over Internet Protocol.

The operative terms of the Oregon and Arizona ICAs are similar or identical, except as indicated herein. We examine each of North County's objections in turn.

A

North County's principal claim is that sections 7.1.1 and 7.2.1.1 of the ICAs, which require North County to interconnect with Qwest directly rather than indirectly, as in,

through a third-party tandem provider, are illegal and unenforceable against it.**⁵**

1

Section 7.2.1.1 of the 2011 ICAs provides that, "[u]nless otherwise agreed to by the Parties, via an amendment to this Agreement, the Parties will directly exchange traffic between their respective networks without the use of third party transit providers." North County claims this provision is unlawful. North County's position appears to be rather strange, given that the 1997 ICAs contained nearly identical language,**⁶** and yet North County has repeatedly stressed that the 1997 ICAs are fully lawful.

Equally troubling is the near total lack of support for North County's argument. North County cites only one authority for the proposition that federal law requires that it be able to force Qwest to interconnect via third-party tandem provider. That authority is a 1996 FCC order in which the FCC stated that "competitive telecommunications carriers that have the obligation to interconnect with requesting carriers may choose, based upon their own characteristics, whether to allow direct or indirect interconnection." *In the Matter of Implementation of the Local Competition*

---

**⁵** North County's direct-vs.-indirect challenge is waived with respect to the Oregon-affected ICA because North County of Oregon never raised it before the Oregon Commission. *See W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 979 (9th Cir. 2012).

**⁶** Section V.A. of the 1997 ICAs declared that, "[a]bsent a separately negotiated agreement to the contrary, the Parties will directly exchange traffic between their respective networks, without the use of third party transit providers."

*Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499, 16171 ¶ 1408 (1996) (hereinafter "*First Report and Order*"). From this, North County concludes that Qwest had a "clear obligation to allow [North County] to select indirect interconnection with [Qwest] when [Qwest] submitted its ICA negotiation requests."

We are not persuaded that the *First Report and Order* renders section 7.2.1.1 unlawful because the FCC ruling is not on point.

In particular, when the above-quoted FCC language highlights a CLEC's leeway to choose direct vs. indirect, it does so for the limited purpose of illustrating that CLECs have different statutory obligations from ILECs. Specifically, the order explains, 47 U.S.C. § 251(c) requires ILECs—but not CLECs—to interconnect directly with requesting carriers. *First Report and Order* at 15991 ¶ 997 ("Section 251 is clear in imposing different obligations on carriers depending upon their classification . . . . For example, section 251(c) specifically imposes obligations upon incumbent LECs to interconnect, upon request, at all technically feasible points. This direct interconnection, however, is not required under section 251(a) of all telecommunications carriers."). CLECs, by contrast, are not subject to § 251(c); CLECs are governed by §§ 251(a) and (b), which do not *require* them to interconnect directly if direct interconnection would be uneconomical or technically infeasible for them. Indeed, the major conclusion reached by the FCC order was that "indirect connection . . . satisfies a telecommunication carrier's duty to interconnect pursuant to section 251(a)." *First Report and Order* ¶ 997. The FCC emphasized that "telecommunications carriers should be permitted to provide interconnection pursuant to section 251(a) either directly or indirectly, based

upon their most efficient technical and economic choices."
*Id.*

In other words, the *First Report and Order* merely
clarified that CLECs are permitted to use indirect
interconnection in order to meet the statutory interconnection
obligations imposed on them by § 251(a). But just because
the statute *permits* CLECs to interconnect indirectly with
other LECs, does not mean that each CLEC has the absolute
right to *demand* indirect interconnection of other LECs under
any and all circumstances. Whatever else it says, the *First
Report and Order* does not condemn the default rule the 2011
ICAs establish.

Hence, the *First Report and Order* does not give North
County the unilateral right to demand indirect interconnection
from Qwest. Nor does the text of the Telecommunications
Act itself give North County that right. For those reasons,
North County cannot establish that the 2011 ICAs violate the
Act simply because they require North County to use direct
interconnection for the time being. If North County is to
succeed in establishing that it was entitled to indirect
interconnection, it must show that the Arizona Commission
acted arbitrarily and capriciously in approving the 2011 ICA
provisions that set direct interconnection as the parties'
default.

2

The Arizona Commission's decision to approve the 2011
ICA's direct interconnection provisions may be set aside as
arbitrary and capricious only if North County demonstrates
that such decision "was not supported by substantial
evidence," or represents a "clear error of judgment" on the

Commission's part. *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 976 (9th Cir. 2012) (quoting *Verizon Cal., Inc. v. Peevey*, 462 F.3d 1142, 1150 (9th Cir. 2006)).

North County makes a single argument: that if North County were allowed to interconnect indirectly with Qwest, specifically "through a third-party tandem provider that utilizes SS7 signaling," then North County's "use of MF signaling" would become "irrelevant." Recall that the impetus for Qwest's request to negotiate the 2011 ICAs was Qwest's claim that North County had been overbilling it and obscuring the inclusion of inflated costs by using the more opaque MF signaling data. North County argues that interconnection through a third-party tandem provider would render Qwest's "reasons for wanting new ICAs . . . moot," and the "direct interconnection ICAs forced on [North County] . . . unnecessary."

North County's argument does not establish that the Arizona Commission committed a clear error of judgment. In the first place, North County has offered no evidence whatsoever to substantiate its assertion that Qwest's legitimate concerns would evaporate if only North County were permitted to connect through a third-party tandem provider. On the contrary, North County's President testified before the Commission that he had "'no clue' what kind of call information its third-party tandem provider gives to Qwest when it passes a call from [North County]." Moreover, in testimony before the Commission, Qwest explained that the parties would need to answer numerous questions about the terms and conditions of indirect interconnection, which were not raised during the parties' pre-arbitration negotiations, before they could interconnect through a third-party tandem provider. Finally, section

7.2.1.1 of the 2011 ICAs expressly allows North County to renegotiate this issue in the future. The Arizona Commission was well within its discretion to approve the provisions requiring direct interconnection for the time being.

B

North County next objects to the 2011 ICAs' Relative Use Factor.

In simplified terms, when someone from Qwest's network calls someone in North County's network—or vice versa— the traffic must be transmitted through certain facilities, called trunk facilities. But transmitting local traffic between the two networks generates costs to the party operating the trunk facilities, and those costs must be divided between Qwest and North County. Under FCC regulations, an ILEC like Qwest may charge a CLEC like North County, but only in proportion to the amount of traffic that originates on the CLEC's network and terminates on the ILEC's network. 47 C.F.R. § 51.703. In an effort to charge North County for the proportion of Qwest–North County traffic that originates with North County, the 2011 ICAs employ a so-called "relative use factor" that assigns 99 percent of the costs to Qwest and 1 percent of the costs to North County, although the ICAs permit this figure to be adjusted after one calendar quarter to reflect actual usage data.

North County objects to the 99:1 ratio; it contends that the 2011 ICAs should assign Qwest 100% of these costs to Qwest because the 2011 ICAs specifically state that North County

does not send any traffic to Qwest.**[7]**  In light of that stipulation, North County argues that it was arbitrary and capricious for the state Commissions to approve a relative use factor of 99:1.

We are not persuaded.  Despite the language in the 2011 ICAs declaring that North County sends no calls to Qwest, there was unrebutted record evidence that North County *does* originate at least some calls to Qwest.  Moreover, Qwest testified that it is unable to determine how much traffic North County originates to it, and neither party supplied the state Commissions with any actual data quantifying their relative use of the trunk facilities.  Given that North County originates some small but unknown amount of traffic, and given that the ICAs allow the Relative Use Factor to be revised after a short period of time, we conclude that it was not arbitrary and capricious for the state Commissions to approve a provisional relative use factor of 99:1.**[8]**

C

North County also contends that the 2011 ICAs violate the Telecommunications Act by requiring North County to

---

**[7]** In particular, section 7.1.1 of the 2011 ICAs states that "[t]he Parties understand and agree that CLEC currently sends no traffic to Qwest and instead terminates traffic either originated by Qwest or originated by other carriers and passed through Qwest to CLEC."

**[8]** To the extent North County challenges the ICA provisions regarding Multiplexing and installation charges, North County waived such challenges with respect to the Oregon-affected ICA.  With respect to the Arizona-affected ICA, such challenges fail because the factual premise of North County's argument is incorrect: Multiplexing and installation charges are not subject to the Relative Use Factor.

use SS7 technology if and when it originates calls to Qwest. North County relies on 47 U.S.C. § 252(i), which provides that "[a] local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement."

As its text makes clear, § 252(i) is a non-discrimination provision. North County's attempt to invoke it fails because nothing in the record suggests that Qwest allows other exchange carriers to do what North County wants to do, namely, to transmit local traffic using only MF signaling. Indeed, the parties' joint statement of undisputed facts filed in the Oregon proceedings indicates that "[North County] is the only CLEC in Oregon that interconnects with [Qwest] using exclusively MF signaling."[9] North County provides no evidence to substantiate any discrimination theory.

Moreover, it was not arbitrary and capricious or otherwise unlawful for Qwest to insist that North County use SS7 signaling if it wants to originate calls to Qwest. Substantial

---

[9] And while Qwest has offered evidence that at least one other CLEC in Oregon "currently interconnects with [Qwest] using the same 1997 ICA that [Qwest] had with [North County]," the 1997 ICA requires the CLEC to "make a good faith effort" to transition to SS7 signaling technology within "4 months" of the execution of that ICA. And, as already explained above, it is undisputed that even the CLEC operating under the 1997 ICA does not now connect with Qwest using MF signaling technology. Because there is simply no evidence that Qwest is permitting any other carrier to do what North County wants to do—namely, transmit local traffic using only MF signaling—there is no basis upon which to find that section 7.2.1.1 violates the Act's non-discrimination provision.

evidence supports Qwest's contention that SS7 signaling has significant benefits when compared to MF signaling; that MF signaling is essentially obsolete; and that North County's use of MF signaling created serious problems for Qwest, in particular by impeding Qwest's ability to bill North County for traffic exchanged between their networks. We therefore conclude that substantial evidence supported the state Commissions' decisions to approve the ICAs' requirements that North County use SS7 signaling if and when it decides to originate traffic to Qwest.

## D

North County next argues that the 2011 ICAs are unlawful because section 7.6 requires North County to pay Qwest for certain call detail records. We reject this challenge because both North County entities failed to raise it before their respective state Commissions, and both district courts below properly refused to entertain it. North County therefore may not assert it here. *W. Radio Servs.*, 678 F.3d at 979.

## E

In its penultimate challenge, North County asks us to invalidate section 7.8 of the ICAs, which impose a cap on the number of minutes for which North County may bill Qwest.

Recall that Qwest is obligated to compensate North County for some portion of the traffic that Qwest sends to North County. Recall, also, that Qwest had claimed that it had been overbilled by North County, and that North County's continued use of MF signaling to terminate calls had made it difficult for Qwest to verify the number of

minutes for which Qwest may lawfully be made to pay North County. Given those circumstances, Qwest insisted that the 2011 ICAs impose a cap on the number of minutes for which North County is authorized to bill it. In Arizona, the cap is 400,000 minutes; in Oregon, it is 240,000 minutes. The Arizona-affected ICA also provides that "[e]ither party may request a modification of the cap, including its elimination, based on verifiably accurate records that the traffic is appropriately subject to reciprocal compensation." Similarly, with respect to the Oregon-affected ICA, Qwest testified that it is "willing to negotiate to amend [the cap] if [North County] can show that it is receiving more minutes over the trunks that are truly local and compensable." North County objects that these caps are arbitrary and capricious.

We have no trouble concluding that substantial evidence supports the state Commissions' decisions to approve the caps. First, the record contains ample evidence of the billing disputes that led Qwest to insist on the caps. Moreover, as the Arizona Commission explained, "[t]he proposed cap of an average of 400,000 minutes of use per month . . . was calculated based on [North County]'s current usage pattern and Qwest's best efforts to analyze that data based on information received from [North County]. [North County] did not provide evidence in this proceeding about its actual use of its in-service circuits, nor did it contest Qwest's calculations." Likewise, Qwest selected the Oregon-affected ICA's 240,000-minute cap based on evidence of North County's actual usage patterns, and in fact, the cap deliberately allows 40% *more* minutes than Qwest currently sends to North County on average. North County has not presented any evidence to undermine the numbers Qwest has proposed.

In short, we conclude that the caps respond to a well-documented, legitimate billing dispute that is the direct consequence of North County's continued use of MF signaling technology. The caps are based on substantial and uncontroverted evidence, and are subject to renegotiation in light of future data. North County has not shown them to be arbitrary and capricious.

F

Finally, North County argues that the Telecommunications Act requires Qwest to allow North County to interconnect with it using Voice over Internet Protocol ("VoIP") technology. North County does not claim that it has an absolute right to demand interconnection through VoIP; instead, North County invokes the Act's non-discrimination provisions, §§ 251(c)(2)(D) and 252(i), to assert that Qwest must offer it VoIP interconnection.

As we discussed above, § 252(i) declares that "[a] local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement." 47 U.S.C. § 252(i). Similarly, § 251(c)(2)(D) requires ILECs to provide interconnection "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title." 47 U.S.C. § 251(c)(2)(D).

North County's argument fails for several reasons. First, with respect to the Oregon-affected ICA, North County never

raised it before the Oregon Commission, and therefore the district court properly concluded that it is waived.

With respect to the Arizona-affected ICA, North County cannot successfully invoke the Act's non-discrimination provisions because it has pointed to no evidence that Qwest provides service using VoIP technology to anyone. To the contrary, Qwest testified below that it does *not* provide VoIP service; only a separate corporate affiliate does. North County cites nothing to rebut such testimony. The non-discrimination provisions of §§ 251(c)(2)(D) and 252(i) therefore have no application.

V

In conclusion, we are satisfied that the Commissions had authority to arbitrate the 2011 ICAs. We are also satisfied that none of the provisions subject to our review violates the Telecommunications Act or its implementing regulations, and that none of the state Commissions' actions were arbitrary or capricious.

The judgments of the district courts are **AFFIRMED.**